# In the United States Court of Appeals for the Federal Circuit

---

ALCON INC., ALCON VISION, LLC,
ALCON LABORATORIES, INC.,
*Plaintiffs-Appellants*

*v.*

PADAGIS ISRAEL PHARMACEUTICALS LTD.,
PADAGIS LLC, PADAGIS US LLC,
*Defendants-Cross-Appellants*

---

Appeal from the United States District Court for the
District of Delaware in No. 1:22-cv-01422-WCB, Judge William C. Bryson

---

**RESPONSE AND REPLY BRIEF OF
PLAINTIFFS-APPELLANTS ALCON INC., ALCON VISION, LLC,
AND ALCON LABORATORIES, INC.**

---

DAVID I. BERL
CHRISTOPHER J. MANDERNACH
ANDREW V. TRASK
CHARLES MCCLOUD
  *Principal Counsel*
ADAM PAN
CHRISTIE CORN
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*

*Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1515, 2025-1577 |
| **Short Case Caption** | Alcon Inc. v. Padagis Israel Pharmaceuticals Ltd. |
| **Filing Party/Entity** | Alcon Inc., Alcon Vision, LLC, Alcon Laboratories, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/01/2025

Signature: /s/ Charles McCloud

Name: Charles McCloud

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Alcon Inc. | | Ciba Vision, LLC |
| Alcon Vision, LLC | | |
| Alcon Laboratories, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable        ☑  Additional pages attached

| | | |
|---|---|---|
| See Exhibit A | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable        ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Exhibit A

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

ALLEN OVERY SHEARMAN STERLING US LLP: Elizabeth J. Holland; William G. James; Daniel P. Margolis; Katherine P. Kieckhafer; Michael Bruns; Mena Gaballah; Ayyan S. Zubair; Michelle Bone; Ryan Curiel

SHAW KELLER LLP: John W. Shaw; Karen E. Keller; Emily S. DiBenedetto; Andrew Russell; Nathan R. Hoeschen

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................1

ARGUMENT ON APPEAL ....................................................................5

I. The District Court Erred in Construing "First Polyol" To Require a Sufficient Amount To Have a "Material Effect." ....................5

    A. The Claims Do Not Require "First Polyol" To Have a "Material Effect." ...................................................................7

    B. The Specification Does Not Support the "Material Effect" Limitation. ..................................................................12

    C. The Prosecution History Does Not Support the "Material Effect" Limitation. ..........................................................24

    D. Extrinsic Evidence Does Not Support the "Material Effect" Limitation. ..............................................................29

    E. The District Court's "Material Effect" Limitation Is Inconsistent with Precedent. .............................................31

II. The District Court Erred by Finding at Summary Judgment That Padagis's ANDA Does Not Seek Permission To Market a Product Within the Scope of the Claims. ..................................36

    A. The IID Is Not a New Issue. ................................................37

    B. A Reasonable Factfinder Could Determine That Padagis's ANDA Seeks Permission To Market a Product Within the Scope of the Claims. .....................................................41

STATEMENT OF THE ISSUE ON CROSS-APPEAL .................................46

STATEMENT OF THE CASE ON CROSS-APPEAL ..................................46

SUMMARY OF ARGUMENT ON CROSS-APPEAL ....................................48

ARGUMENT ON CROSS-APPEAL ........................................................49

I.    Standard of Review ........................................................49

II.   The District Court's Determination Concerning Enablement
      Should Be Affirmed. ................................................49

III.  The District Court's Determination Concerning Non-
      Obviousness Should Be Affirmed. ........................56

CONCLUSION ........................................................................68

Page

## CASES

*Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ............... *passim*

*Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367 (Fed. Cir. 2002) .................. 44

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
659 F.3d 1121 (Fed. Cir. 2011) ........................................................ 16

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011) ...... 35

*Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293 (Fed. Cir. 2015) ........................ 66

*AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18 (Fed. Cir. 2023) ............... 10

*Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034 (Fed. Cir. 2016) ................. 29

*Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461 (Fed. Cir. 1988) ............... 49

*ChromaDex, Inc. v. Elysium Health, Inc.*,
59 F.4th 1280 (Fed. Cir. 2023) ........................................... 6, 32, 33, 34

*Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788 (Fed. Cir. 2019) ............. 16, 17, 53

*Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003) ............ 19

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) .................... 20

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009) ....... 30

*Express Mobile, Inc. v. Meta Platforms, Inc.*,
No. 2023-1646, 2025 WL 1693494 (Fed. Cir. June 17, 2025) ........................ 38

*Ferring B.V. v. Watson Lab'ys, Inc.-Fla. (Ferring I)*,
764 F.3d 1382 (Fed. Cir. 2014) ........................................................ 42

*Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562 (Fed. Cir. 1997) .................... 44

*i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010) ................................ 19

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ........................................................ 40

*Intell. Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017) ........................................................ 11

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ........................................................ 57

*Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346 (Fed. Cir. 2020) ........................... 21

*Lab'y Corp. of Am. Holdings v. Qiagen Scis., LLC*,
148 F.4th 1350 (Fed. Cir. 2025) .................................................... 8, 30

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
215 F.3d 1281 (Fed. Cir. 2000) ........................................................ 35

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. 2006) ........................................................ 21

Cases—continued:

*Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007) ...................27

*Par Pharm., Inc. v. Hospira, Inc.*,
    835 F. App'x 578 (Fed. Cir. 2020) ........................................42, 45

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).....5, 6, 12, 53

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008)...........................17

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) ...............................................27

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ..............................................51

*Sanders v. Mosaic Co.*, 418 F. App'x 914 (Fed. Cir. 2011)................6, 28, 32, 34

*Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*,
    528 F.3d 1365 (Fed. Cir. 2008) ...............................................49

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
    8 F.4th 1285 (Fed. Cir. 2021)..................................................29

*Sigray, Inc. v. Carl Zeiss X-Ray Microscopy, Inc.*,
    137 F.4th 1372 (Fed. Cir. 2025).................................................36

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) ....................................*passim*

*Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358 (Fed Cir. 2014)..............38, 39

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271
    (Fed. Cir. 2013) ..................................................*passim*

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ...............................................29

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................*passim*

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) .......................................13, 17, 53

*Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374 (Fed. Cir. 2016)...................11

# INTRODUCTION

The plain meaning of the claim language "a first polyol, the first polyol being selected from mannitol, sorbitol or a combination thereof" simply requires a chemical structure that is a polyol—and specifically the structure of mannitol or sorbitol. The district court was wrong to require that the first polyol also be present in "a sufficient amount . . . to have a material effect on the claimed composition." Appx32. That atextual limitation is inconsistent with the patent's other claim language, the specification, the prosecution history, and this Court's precedent, which has repeatedly explained that claim language carrying "an established and unambiguous structural definition" encompasses trace amounts of the named structure. *E.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338-41 (Fed. Cir. 2005).

Padagis tellingly abandons the case law that the district court relied on to support its construction. Instead, Padagis primarily asserts that because the claims require an "effective amount" of borate, they necessarily also require an "effective amount" of first polyol. The district court did not adopt that misguided rationale, and neither should this Court. Among other problems, Padagis's effective-amount argument overlooks definitional language in the specification expressly providing that the modifier cannot be

1

grafted from one component (*i.e.*, borate) to another (*i.e.*, first polyol). Padagis's other arguments rest on similar distortions of the intrinsic record. For example, Padagis misinterprets the specification's present-invention statements, improperly relies on other statements that are explicitly preferential, and overreads snippets of irrelevant prosecution history.

Padagis also accuses Alcon of advocating for a new *per se* rule of claim construction, under which a claim that "mentions a chemical structure" automatically includes trace amounts of that structure. Padagis Br. 44. That argument is a sideshow. Alcon does not ask the Court to blind itself to the intrinsic record. To the contrary, the specification reinforces **Alcon's** view that although two polyols are required, there is no minimum amount for the claims' "first polyol." In any event, there is nothing unprecedented about construing a structural term to require just that structure, rather than that structure in some amount. If anything, it is Padagis that asks the Court to break new ground by departing from *SmithKline* and multiple other decisions adopting exactly that construction based on materially similar intrinsic evidence. The district court's claim-construction order concerning the first-polyol limitation in claims 1-3 and 6-12 of the '265 patent should be reversed.

Independently, Padagis fails to persuasively defend the district court's summary-judgment decision finding no literal infringement. Padagis's ANDA acknowledged that mannitol could carry over from another product into Padagis's ANDA Product, and it referenced the maximum-potency limit for mannitol contained in FDA's Inactive Ingredient Database ("IID"). That evidence generates a genuine dispute of fact as to whether Padagis's ANDA seeks permission to market a product containing mannitol within the relevant claims' first-polyol concentration ranges—and thus constitutes literal infringement under *Sunovion Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, 731 F.3d 1271 (Fed. Cir. 2013).

Padagis contends that Alcon forfeited any argument about the IID. But Alcon raised the IID in its expert report and pointed to that report and the IID at summary judgment. And the district court specifically addressed Alcon's IID-based argument at summary judgment; it just read the record incorrectly. Forfeiture is not merited on these facts. Padagis's remaining arguments on the summary-judgment order fare no better. Padagis downplays the statement it made concerning the IID, suggesting that it related only to preliminary formulations. But the critical point is that Padagis undisputedly made those representations about mannitol while seeking FDA

approval for its ANDA Product. Drawing all inferences in favor of Alcon, the evidence was sufficient to require a trial to resolve the question of infringement for claims 13-19 of the '265 patent and claims 1-3 and 6-23 of the '484 patent.

With respect to the cross-appeal, Padagis attempts to create inconsistency where none exists. The district court correctly found that Padagis failed to prove that the claims (1) are not enabled and (2) would have been obvious. As to the enablement ruling, Padagis seeks vacatur based exclusively on an erroneous premise: that the claims require the composition to meet certain industry standards for preservative efficacy. The district court correctly rejected that argument, determining that the claims require the benzalkonium chloride ("BAC") of the composition to exhibit only some amount of anti-microbial effect.

As to the non-obviousness ruling, Padagis asserts that the district court applied an understanding of claim scope inconsistent with its enablement analysis. In fact, in its non-obviousness analysis, the district court never stated or suggested that the claims required BAC to have more than some amount anti-microbial effect. Instead, the ruling hinged on Padagis's failure to offer any evidence to support critical aspects of its case—even under the

understanding of preservative efficacy that Padagis advanced. Padagis's suggestion that it should nevertheless be permitted a do-over in district court is meritless. This Court should affirm the district court's finding of no invalidity for claims 13-19 of the '265 patent.

## ARGUMENT ON APPEAL

### I. The District Court Erred in Construing "First Polyol" To Require a Sufficient Amount To Have a "Material Effect."

The district court erred in deviating from the plain meaning of the claim language and imposing an additional, unstated limitation. Indeed, the district court acknowledged that the material-effect requirement it imposed was contrary to the plain meaning of the claims, noting that the "claim language does not specify a minimum concentration for the first polyol." Appx25; *see also* Padagis Br. 30 ("Claim 1 does not identify a specific concentration range for the first polyol."). But the district court departed from plain meaning anyway, relying on citations from the specification and prosecution history that do not justify redefining the unambiguous structural term, "first polyol."

Padagis accuses Alcon of disregarding *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), by "propos[ing] what amounts to a special rule that a claim that mentions a chemical structure is a structural definition and therefore must be read to include 'trace or *de minimis*' amounts

5

of a compound." Padagis Br. 44 (quoting Alcon Br. 27). That is a blatant misrepresentation of Alcon's position. Alcon's "proposal" simply follows from what this Court's decisions, including post-*Phillips* decisions, already hold: when a claim recites "an established and unambiguous structural definition," the plain meaning of that term encompasses trace amounts of that structure. *SmithKline*, 403 F.3d at 1338-41; *see, e.g.*, *Sanders v. Mosaic Co.*, 418 F. App'x 914, 916-18 (Fed. Cir. 2011) (non-precedential) (citing *Phillips* and explaining that "the plain language of the claim" reciting a "soil nutrient composition comprising . . . a micronutrient" "includes no limitation on the amount of micronutrient present in the composition").[1] Although the specification and other intrinsic evidence can of course demonstrate that the patentee departed from that plain meaning, that evidence must "clear[ly] and explicit[ly]" redefine or disavow the full scope of the claim. *E.g.*, *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365-68 (Fed. Cir. 2012) (citing *Phillips*); *see also* Alcon Br. 27 (collecting cases). As demonstrated below, the

---

[1] *See also, e.g.*, *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1288, 1299 (Fed. Cir. 2009) (citing *Phillips*); *ChromaDex, Inc. v. Elysium Health, Inc.*, 59 F.4th 1280, 1284-85 (Fed. Cir. 2023) (decided after *Phillips*).

intrinsic evidence here does not come close to meeting that "exacting" standard. *Thorner*, 669 F.3d at 1366.[2]

### A. The Claims Do Not Require "First Polyol" To Have a "Material Effect."

1. Padagis primarily attempts to square the district court's material-effect construction with claim 1's language through a three-part syllogism that was not part of the district court's reasoning: (1) the claims separately require an "effective amount" of borate; (2) borate's efficacy "is tied directly to the amount of mannitol or sorbitol in the composition"; therefore, (3) the claims must also require an "effective amount" of first polyol. *Compare, e.g.*, Padagis Br. 30-34, *with* Appx26 (referencing "effective amount" only when reproducing claims). That contorted argument fails both in light of this Court's precedent, and in light of this patent's express definitions of "effective amount" and "polyol."[3]

---

[2] In passing, Padagis attempts to distinguish *Thorner* factually, but does not disagree with *Thorner*'s framing of the legal standard. *See* Padagis Br. 50.

[3] Many of Padagis's arguments in its claim-language section rest not on the claim language, or even the specification's express definitions of relevant claim language, but rather on other portions of the specification. Any such argument not addressed in this subsection is addressed below in Section I.B.

To begin, nothing in the claim language suggests that the efficacy of borate depends in any way on the amount of first polyol. In fact, Padagis gets it backwards: that the claims require borate, but not the first polyol, in an "effective amount" supports **Alcon's** reading of the first-polyol limitation, not the district court's. As this Court has explained, "where two claim terms differ by a matter of degree, perhaps by use of a modifier for one term and not the other, a proper construction should give effect to that difference." *Lab'y Corp. of Am. Holdings v. Qiagen Scis., LLC*, 148 F.4th 1350, 1358 (Fed. Cir. 2025). That's the case here. While the claims modify "borate" by specifying that it must exist in an "effective amount," they pointedly do not require the same for the "first polyol." Appx140 (18:8-9, 12-13). A "proper construction," therefore, "should give effect to that difference" by not imposing the unstated requirement that the first polyol exist in an effective amount. *Lab'y Corp.*, 148 F.4th at 1358; *see also* Alcon Br. 39-40.

Padagis's argument also directly conflicts with the patent's definition of "effective amount." Padagis truncates the specification's discussion of that modifier, *see* Padagis Br. 31, but the passage in full explains that "the phrase 'an effective amount of' means that a **specified component** is present in the composition in an amount sufficient to have an impact on the therapeutic

capability, the buffering capability, the preservative capability and/or the anti-microbial capability of the composition." Appx133 (4:21-26) (emphasis added). That express definition conclusively shows that by specifying an "effective amount" of one component (borate), the claim language does not require that other components (*e.g.*, the first polyol) also be present in effective amounts.

Finally, Padagis's attempt to apply borate's effective-amount modifier to the first-polyol limitation ignores that the specification has its own lexicography for "polyol." *See* Alcon Br. 28-29, 43-44. The specification defines "polyol" to be "any compound," singular, having certain structural features: "at least one hydroxyl group on each of two adjacent carbon atoms that are not in trans configuration relative to each other." Appx133 (4:7-10); *see also* Appx73 (recognizing that polyol, mannitol, and sorbitol are all chemical structures). That structural definition does not require effective amounts.

Nor is it relevant that the definition of "polyol" is included within the "context" of borate-polyol complexes. *Contra* Padagis Br. 46, 49-50. The "context" Padagis identifies is a specification passage that defines "borate" structurally, *see* Appx133 (3:61-63), defines "polyol" structurally, Appx133 (4:7-10), and explains how borate can complex with "a polyol," Appx133 (3:66-

4:4).  Nowhere does that passage state or even suggest that the first polyol must exist in some threshold amount—to complex with borate, to render borate effective, or for any other reason.  *Contra AlterWAN, Inc. v. Amazon.com, Inc.*, 63 F.4th 18, 23-24 (Fed. Cir. 2023) (deviating from a lexicographical definition only because the claim language was ambiguous and the specification did not "remotely suggest operability" for the system as construed).  If anything, the passage undercuts Padagis's argument, making clear that it is not just the first polyol that forms such borate-polyol complexes.  *See* Appx133 (3:66-4:1) ("Borate interacts with polyols, such as glycerol, propylene glycol, sorbitol and mannitol, to form borate-polyol complexes."); Appx140 (18:10-11) (listing propylene glycol and glycerine as the "second polyol" of the claimed invention).[4]

---

[4] Padagis also twice asserts that "[t]he patent . . . excludes from its scope **any** polyols without the configuration needed to form borate-polyol complexes." Padagis Br. 46; *see also id.* at 49.  The citation provided merely (1) includes the definition for "polyol" as "any compound having at least one hydroxyl group on each of two adjacent carbon atoms that are not in trans configuration relative to each other" and (2) explains that "[t]he type and ratio of [borate-polyol] complexes depends on the number of OH groups of a polyol on adjacent carbon atoms that are not in trans configuration relative to each other." Appx133 (3:61-4:16).  The patent does not state that it is excluding structures that cannot complex with borate.

2.    The district court's material-effect limitation is also inconsistent with the fact that several of the patent's other claims expressly recite a minimum amount of "first polyol."  Alcon Br. 40-41.  Padagis never disputes this significant difference between the claims; it just contends the difference is irrelevant because "claim differentiation 'does not serve to broaden claims beyond their meaning in light of the specification.'"  Padagis Br. 32 (quoting *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017)).  But by pointing to the patent's other claims specifying minimum amounts of "first polyol," Alcon does not seek to broaden claim 1's reference to "first polyol"—it still means a polyol structure as defined in the specification, and specifically mannitol or sorbitol.  Alcon seeks only to avoid that structural term being improperly ***narrowed***, contrary to its plain meaning.

Padagis also argues that "this is not an instance where the [district court's] construction [of claim 1] results in 'exactly the same claim scope'" as the other concentration-limited claims.  Padagis Br. 32-33 (quoting *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1391 (Fed. Cir. 2016)).  It is true that the district court's construction of "first polyol" in claim 1 does not render those other claims redundant or meaningless.  But even in the absence of

complete superfluity, "[d]ifferences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314-15. At a minimum, the differing claim language here should demonstrate that if Alcon had wished to require that the "first polyol" in claim 1 be present in some threshold amount, it knew ways to do so. Alcon chose not to include such a limitation, and the district court's construction fails to give effect to that decision, which the claim language reflects.

## B. The Specification Does Not Support the "Material Effect" Limitation.

Alcon is entitled "to obtain the full scope" of the plain meaning of the claims, "unless [it] explicitly redefines the term or disavows its full scope" in the specification or prosecution history. *Thorner*, 669 F.3d at 1365-68. Here, the specification neither explicitly limits the term "first polyol" to a threshold amount, nor disavows its full scope in favor of functional restrictions. To the contrary, the specification expressly defines "polyol" to include "any compound" with certain structural features. *See supra* Section I.A. Especially in light of that lexicography, the remainder of the specification falls far short of the "clear and explicit" disavowal required. *Thorner*, 669 F.3d at 1367-68; *see* Alcon Br. at 44-49. Padagis's four rejoinders, grounded in the specification's (1) present-invention statements, (2) descriptions of the

functions or benefits of polyols, (3) the definition of the term "substantially free of," and (4) other miscellaneous statements, are unavailing.

1.    Padagis relies most heavily on the specification's statements concerning "the present invention."  Padagis Br. 34-38.  According to Padagis, those statements show the first polyol must exist in a material amount.  That is incorrect, for several reasons.

a.    For starters, Padagis identifies *zero* instances where the patent states that the present invention involves any specific amount of the first polyol, or that the present invention requires an effective amount of the first polyol.  That is the limitation the district court read into the claims, and yet Padagis's cited statements make no mention of it.  That alone materially distinguishes this case from the primary present-invention case upon which Padagis relies.  *See* Padagis Br. 35, 51; *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (reading in a limitation that "the patented gateway system 'compress/decompress and packetize voice signals'" based on present-invention language stating that "the gateway compresses and decompresses voice frequency communication signals and sends and receives the compressed signals in packet form via the network" (cleaned up)).

b.    Padagis also overreads the present-invention language that it cites.  For example, Padagis points to the specification's description of the "present invention" as "predicated upon the provision of two or more different polyols."  Padagis Br. 37 (quoting Appx133 (3:43-48)); *id.* at 34 ("The 'present invention' is using a first polyol . . . and a second polyol . . . ." (citing Appx133 (3:25-39) (emphasis omitted)).  But language merely referencing two polyols says nothing about ***what amount*** of the first polyol the composition must have.  Accordingly, such statements are perfectly consistent with Alcon's construction.  Alcon ***agrees*** that the claims require two polyols, including a first polyol.  The question is just whether the claims require a first polyol in some minimum amount.  The answer is no, and the two-polyol statements do not change that answer.

Padagis also repeatedly highlights a statement in the specification, which, unabridged, reads:

> The present invention is directed to pharmaceutical compositions formulated so as to have sufficient antimicrobial activity to satisfy the preservation efficacy requirements of the United States Pharmacopeia ("USP") and analogous guidelines in other countries.  The ability to achieve preservation is based on a unique combination of formulation components and particularly the use of two or more different polyols in combination with borate and a preservative, particularly BAC.

Appx132 (1:28-36); *see* Padagis Br. at 29-30, 35-36, 45, 50-51. From there, Padagis infers that the first polyol must be in an amount such that it "ha[s] a significant role in the effectiveness of the composition." Padagis Br. 35 (quoting Appx28). As Padagis itself recognizes, however, "[t]he court did not impose a particular level of efficacy" on the relevant claims. *Id.* at 33. As a result, the claims plainly do not encompass this present-invention statement, making it irrelevant.[5]

Furthermore, assuming arguendo that the claims did have the same functional requirements as the unique-combination statement, that statement still does not suggest that a given amount of first polyol is necessary to meet those (unclaimed) requirements. Just because the specification describes the present invention as a unique composition using two or more polyols and therefore having some desired properties, that does not mean that the invention must have ***specific amounts*** of one of the two polyols. To the contrary, as this passage makes clear, these unclaimed benefits flow from the

---

[5] Indeed, the district court correctly found that other claims with the same functional requirements do not require the compositions to have sufficient anti-microbial activity to meet preservative efficacy standards. *See infra* Argument on Cross-Appeal (Section II); Appx115; Appx140-141 (18:14-16, 19:28-30) (claims 1 and 13 both specifying that BAC be "an anti-microbial preservative" in a "multi-dose ophthalmic composition").

formulation as a whole, not the presence of any particular amount of first polyol. *See* Appx132 (1:28-36).[6]

      c.     Finally, even if some of the patent's present-invention statements mentioned or suggested the need for a material amount of first polyol, Padagis is wrong to imply that such language would be limiting. To be sure, "descriptions of the present invention ***as a whole*** could limit the scope of the invention," such as where the descriptions consistently indicate that the invention must have the unclaimed feature. *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) (cleaned up and emphasis added). But present-invention descriptions are not limiting where they are permissive, *e.g.*, "disclose one way to carry out the present invention," where they "are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Id.* (quoting *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011)). That is the case here.

---

[6] The remaining present-invention passages Padagis cites do not support its claim construction for the same reasons the unique-composition one does not. *See* Appx130 (Abstract); Appx132 (1:15-25); Appx133 (3:41-50); Appx134 (6:44-49).

For instance, after stating that the "present invention is predicated upon the provision of two or more different polyols in the presence of borate and [BAC] for providing a pharmaceutical composition and particularly an ophthalmic composition that exhibits desired anti-microbial activity and/or desired buffering activity," the patent immediately adds: "Thus, the ophthalmic composition *typically* includes a first polyol, a second polyol different from the first polyol, BAC and borate." Appx133 (3:43-50) (emphasis added). The use of the term "typically" suggests that the patent contemplates variations of the "present invention" that do not include all these components. *See, e.g.*, *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323 (Fed. Cir. 2008) (explaining that when "the word 'typically' appears," it "impl[ies] that the passage describes only the most common embodiment rather than the full scope of the invention"). Given the fact that the invention as contemplated by the specification can include *no* first polyol, "it is difficult to say that the present invention 'as a whole,' necessarily includes" *material* amounts of first polyol. *Cont'l Cirs.*, 915 F.3d at 798 (quoting *Verizon*, 503 F.3d at 1308).

In addition, several "other portions" of the intrinsic evidence do not support narrowing the "first polyol" term to first polyols in material amounts. *Id.* These include, for example, the claims' choice to use the "effective amount"

modifier for only the borate component, and the specification's express definition of "polyol" as "any compound" with certain structural features. *See supra* Section I.A.

2.    Padagis also invokes other statements in the specification concerning the purpose or benefits of polyols in compositions with low amounts of borate or BAC.  But a closer look at Padagis's favored citations reveals that they do not bear the weight Padagis places on them.

a.    Regarding compositions with low amounts of borate, Padagis repeatedly cites statements discussing the benefits (and drawbacks) mannitol or sorbitol ***can*** provide.  *See* Padagis Br. 30-33, 36, 45-46, 50-51; Appx132 (2:53-64) (explaining that "increase[s] in amounts of polyol such as sorbitol or mannitol can significantly increase anti-microbial activity"); Appx133 (3:9-23) (explaining that "polyols, particularly mannitol, sorbitol or both, can significantly enhance the resistance to normalization of tear pH of the borate component," making "relatively low concentrations" "typically desirable," but that "lower concentrations can limit or lower the anti-microbial activity"). Similarly, Padagis points to properties the first polyol ***preferably*** possesses. *See* Padagis Br. 30, 34, 46; Appx133 (4:59-62) ("The first polyol is preferably one that significantly enhances the resistance of the borate component to

normalization of tear pH."). Those equivocal statements are not proper bases upon which to find disclaimer. *See, e.g., i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010) ("The specification's permissive language . . . 'can be created' . . . does not clearly disclaim systems lacking these benefits."); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) ("[T]he use of the term 'preferably' makes clear that the language describes a preferred embodiment, not the invention as a whole."); *see also* Alcon Br. 46-47 (collecting cases).

Likewise, Padagis asserts that "'two or more different polyols' are what allows 'lower concentrations of borate' to 'produce unexpectedly superior antimicrobial activity, preservation efficacy, desired buffering or a combination thereof.'" Padagis Br. 35 (citing Appx134 (6:1-7)); *see also* Padagis Br. 32-33, 36, 41, 45-46. But in full, Padagis's citation reads:

> Generally, it is contemplated that various amounts of borate can be included in the ophthalmic compositions of the present invention. However, it has been found that lower concentrations of borate, when used in combination with the two or more different polyols, can produce unexpectedly superior antimicrobial activity, preservation efficacy, desired buffering or a combination thereof.

Appx134 (6:1-7). That statement does not constitute disavowal of the full scope of the first-polyol limitation, for several reasons.

For one, much like the present-invention statements, the passage says nothing about what amount of a first polyol specifically is necessary to allow borate to achieve the specified results. This tracks Alcon's construction, not Padagis's, by mentioning two polyols, but not an amount for the first polyol.

Further, the passage just says that borate, when combined with two or more polyols, "can produce unexpectedly superior" results—results that are unclaimed. *See* Appx140 (18:12-13) (claim 1 requiring borate to be in an "effective amount," not have "unexpectedly superior" activity); Appx133 (4:21.26) (defining "effective amount" to mean merely "an amount sufficient to have an impact" on buffering capability, anti-microbial capability, etc.). Such language advertising unclaimed benefits or functions cannot restrict the claim scope of a structural term—just as in *SmithKline*, where this Court reversed a construction of a chemical-structure term excluding trace amounts because "[a] description of characteristics," such as "superior handling properties," in the specification "does not redefine a compound." 403 F.3d at 1339; *see also, e.g.*, *Abbott*, 566 F.3d at 1299 (explaining a construction excluding trace amounts of a chemical structure that could not "be a contributing factor in efficacy" would be incorrect where the claim "contains no . . . limitations relating to efficacy"); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1365-67

(Fed. Cir. 2001) (rejecting a construction attempting to redefine a structural term in light of its function even where the "patentee noted the functional import" in the intrinsic record); Alcon Br. 46 (collecting cases).

By contrast, Padagis's cases on this point are readily distinguishable. *See* Padagis Br. 28, 36. For instance, in *On Demand Machine Corp. v. Ingram Industries, Inc.*, this Court construed "customer" to mean direct retail customers, but it did so because the "specification repeatedly reinforces its usage of the term 'customer' as the retail consumer." 442 F.3d 1331, 1340 (Fed. Cir. 2006). There is no repeated linkage in this specification between the first polyol and effective amounts of it. *Kaken Pharmaceutical Co. v. Iancu*, 952 F.3d 1346 (Fed. Cir. 2020), is even further afield. Among other differences, *Kaken* construed a method claim requiring "treating a subject having onychomycosis" to mean treating fungal infections inside or under the nail plate, not any part of the nail, based in part on "decisive support" from the prosecution history. *Id.* at 1350-54. As explained below, no such support exists here. *See infra* Section I.C.

b.    In a similar vein, Padagis makes passing references to the specification's discussion of BAC, for example contending that "[t]he appropriate amount of mannitol or sorbitol is particularly important because

'BAC can rapidly lose its anti-microbial efficacy when its concentration falls below certain threshold levels.'" Padagis Br. 32-34 (quoting Appx132 (2:35-45)); *see also id.* at 38 (quoting Appx135 (8:60-64)). But as with the borate-related disclosures, neither of the BAC-related disclosures that Padagis identifies makes any mention of a minimum amount of first polyol needed for BAC to remain an anti-microbial preservative in the claimed compositions.

3.     Next, Padagis maintains that the first-polyol limitation cannot be read to encompass nominal amounts because the patent defines the term "substantially free of" to include nominal amounts. *See* Padagis Br. 37. Padagis's argument seems to be that a composition "comprising" a first polyol cannot also be "substantially free of" a first polyol. Here again, Padagis raises an argument the district court did not adopt. *See* Appx27-29; Appx955. And here again, it attempts to rewrite the claims in a manner inconsistent with the claim language. Claim 13, for example, specifically requires the composition to be "substantially free of any preservatives other than [BAC]." Appx141 (19:32-33). If Alcon had intended to similarly limit claim 1 to a composition that "is not substantially free of first polyol," it could have done so. It did not.

Regardless, the supposed inconsistency Padagis identifies is illusory. The specification defines "substantially free of" to mean that the composition is "*either* entirely devoid of that particular ingredient *or* includes only a nominal amount of that particular ingredient." Appx133 (4:42-46) (emphasis added). The specification also defines "polyol" to be "any compound" with a specified structure, full stop, without any provision that the structure exist in a certain amount. Appx133 (4:7-10). Accordingly, to the extent a composition is "substantially free of" a first polyol because it is entirely devoid of that ingredient, it is not covered because it does not contain the required structure. But to the extent a composition is "substantially free of" a first polyol because it has only a nominal amount of that ingredient, it is covered because it contains at least some of the required structure. There is no inherent contradiction, or absurdity, in that outcome. *See supra* p. 10; *infra* p. 35.

4.      Padagis's remaining specification citations do not support the district court's construction either. *See* Padagis Br. 37-38. For example, Padagis notes that, according to the specification, "the first polyol is *typically* at least about 0.01 w/v %." Padagis Br. 37 (quoting Appx134 (5:25-27)) (emphasis altered). However, as Alcon's opening brief explained, it is black-letter law that such preferred embodiments cannot be used to narrow the

unvarnished recitation of "first polyol" in the claims. *See* Alcon Br. 46-48; *supra* p. 17. Padagis provides no reply, other than to baldly protest that such statements are somehow not "preferential or permissive." Padagis Br. 51. Likewise, Padagis points to the patent's "example formulations A-M" and argues that "[t]he patent criticizes examples F and G, which lack one or both polyols, for failing microbial testing." Padagis Br. 37-38. Again, Padagis does not meaningfully respond to the myriad of reasons Alcon provided for why those examples do not support restricting the scope of the first-polyol limitation: neither example omits only the first polyol, the examples still exhibit some level of anti-microbial activity, and criticism of an example does not amount to disavowal. *See* Alcon Br. 48-49. Instead, Padagis retreats to its present-invention arguments, *see* Padagis Br. 52, which are wrong for the reasons described above.

## C. The Prosecution History Does Not Support the "Material Effect" Limitation.

Like the specification, the prosecution history does not provide the clear disavowal that would be required to depart from the plain meaning of the term "first polyol." *See, e.g.*, *Thorner*, 669 F.3d at 1365-67. In fact, Padagis implicitly concedes that nothing in the prosecution history rises to the level of disclaimer, *see* Padagis Br. 38-41 (repeatedly making arguments about what

the prosecution history "suggests"), tracking the district court's concession that the prosecution history was "not conclusive," Appx30.

Padagis nevertheless focuses on three passages, spread out over five bullets, arguing that they "elucidate the critical role of the first polyol in making borate 'effective' at the low claimed concentrations, and support the court's analysis." Padagis Br. 39-40. Not so.

*First*, as Padagis itself admits, its citations come from the prosecution history of the '484 patent, parent to the '265 patent, not from the prosecution history of the '265 patent itself. *See* Padagis Br. 39. To the extent looking at these statements is even permissible, most of the passages Padagis identifies say nothing about some functional, threshold amount for the first polyol in the asserted claims.

For example, in its first and fifth bullets, Padagis cites statements where the Applicant expressed "surprise" and "unexpected success" concerning preservation efficacy for compositions with low levels of borate. Padagis Br. 39 (quoting Appx1806-1808). These statements were made in reference to the amount of borate (and BAC) in the claims—the term "polyol" is conspicuously absent from the remarks. *See* Appx1806-1808. The second-bullet statement concerning "excellent preservation efficacy using a low

concentration of borate" also does not mention the first polyol. Appx1837; Appx1861.

With regards to the fourth-bullet statement, Padagis claims that the Applicant characterized the claimed invention as "'achiev[ing] excellent preservation efficacy' with low concentrations of borate/first polyol." Padagis Br. 39 (quoting Appx1837-1838). In fact, the Applicant's statement that the claimed composition is "able to achieve excellent preservation efficacy using a low concentration of borate" was followed by a separate statement that "[t]he composition can also use a low concentration of first polyol (i.e., mannitol and/or sorbitol)." Appx1837. The Applicant further explained that excessive concentrations of borate and mannitol and/or sorbitol could "cause significant ocular irritation." Appx1837; *see also* Appx133 (3:3-15) (similar statement in specification). So while these statements, taken together, might suggest that the Applicant sought to distinguish compositions having "high concentrations" of borate and first polyol, Appx1837, they provide no support for Padagis's argument that the claims require a minimum amount of first polyol.

*Second*, any statement from the '484 prosecution history that does speak to the amount of first polyol is not a proper basis for disclaimer for claim 1 of the '265 patent.

Take, for instance, the third-bullet statement concerning the "criticality of the concentration[] of . . . first polyol." Appx1861-1862. That statement was made with respect to particular pending claims in the parent application, each of which recited specific concentrations of first polyol. *See* Appx1854-1862 (discussing pending claims 1-8 and 10-23). It is thus inapplicable to claim 1 of the '265 child patent, which was "materially altered" and lacks a concentration range for the first polyol. *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 943 (Fed. Cir. 2013) ("[O]ur cases establish that the two patents must have the same or closely related claim limitation language.").[7]

Nor was the criticality statement incorporated into the '265 prosecution history. Before the supposed incorporation, the Examiner noted that the prior art and pending claims differed with respect to "the claimed concentrations" and sought "evidence indicating [the claimed] concentrations are critical." Appx1883-1885; *see also* Padagis Br. 11. In response, the Applicant "incorporated . . . by reference" certain arguments from the '484 prosecution

---

[7] These facts also distinguish this case from Padagis's lead prosecution-history case, *Ormco Corp. v. Align Technology, Inc.*, 498 F.3d 1307 (Fed. Cir. 2007). *See* Padagis Br. 51-52. As the Court explained in *Regents*, the holding of *Ormco* applies only "when the disclaimer is directed to the scope of the invention as a whole, not a particular claim." 717 F.3d at 943 n.8.

history, but it expressly limited that incorporation "[t]o the extent that those discussions can be applied to the subject matter of the claims of the present application." Appx1896-1898 (also making distinct arguments for patentability based on the suspending agent, carboxyvinyl polymer). Given that pending claim 1 lacked any concentration ranges for the first polyol at the time of that statement—just as it did when the Examiner initially sought evidence as to criticality of claimed concentrations—any discussions pertaining to the amount of the first polyol from the prosecution history of the '484 patent were not incorporated for that claim. *See* Padagis Br. 39 (admitting pending claim 1 at time of the rejection "did not include a particular first polyol range"); *id.* at 40 (admitting pending claim 1 at time of the incorporation did not "include[] a specific concentration range for the first polyol").

Padagis responds that such statements in the prosecution history of the '484 parent patent remained relevant at the time of the incorporation because "then-pending claim 1 [of the application that issued as the '265 patent] . . . did set express limits on the amount of borate and BAC." Padagis Br. 40-41 (distinguishing *Sanders*, 418 F. App'x 914, on that basis). But, as explained above, nothing in the claims or specification establishes that some minimum

amount of first polyol is necessary for compositions with the claimed amounts of borate and BAC. *See supra* Sections I.A-B.

## D. Extrinsic Evidence Does Not Support the "Material Effect" Limitation.

Padagis also attempts to defend the district court's faulty construction with extrinsic evidence from Alcon's experts, elicited ***at trial*** and ***after*** the district court had entered its claim construction. *See* Padagis Br. 42-44. Padagis's argument fails for four independent reasons.

*First*, "there is no reason to resort to extrinsic evidence" here because the scope of "first polyol" is "clear from the intrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021); *see supra* Sections I.A-C. While Alcon's expert testimony in fact confirms that the proper scope of "first polyol" encompasses any non-zero amount, *see infra* p. 31, that evidence is not necessary to reverse the district court's claim construction.

*Second*, even if extrinsic evidence were necessary, Padagis improperly asks this Court to make factual determinations. The consideration of extrinsic evidence requires "subsidiary factual findings." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1339 (Fed. Cir. 2015). "[S]uch fact findings are indisputably the province of the district court." *Apple Inc. v. Samsung Elecs.*

*Co.*, 839 F.3d 1034, 1039 (Fed. Cir. 2016) (declining to rely on "extra-record extrinsic evidence in the first instance" to construe a claim term). Padagis does not dispute that the district court never made ***any*** factual findings as part of its claim-construction determination, let alone relied on the post-construction expert testimony that it now cites. *See* Appx27-32; Alcon Br. 26-27; Padagis Br. 27-29 (not disputing Alcon's Standard of Review). This Court should reject Padagis's invitation to consider extrinsic evidence that never factored into the district court's claim construction.

*Third*, the statements cited by Padagis lack any probative value as to the meaning of "first polyol" in claim 1 of the '265 patent because they were elicited (1) in the context of a doctrine-of-equivalents analysis involving different claims, and (2) in the wake of the district court's claim construction. Under the function-way-result framework for analyzing infringement under the doctrine of equivalents, courts must identify a "function," even for structural limitations. *See Lab'y Corp.*, 148 F.4th at 1359-60. Additionally, "[o]nce a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). Padagis's circular argument that the district

court's construction is correct because Alcon's experts did as they were required—*i.e.*, identified a function for the first polyol and applied the prior construction—makes little sense and should not be credited. *See, e.g.*, Appx4528 (136:3-15) (first polyol "increas[es] the buffer capacity"); Appx4581 (189:15-23) (first polyol "enhance[s] antimicrobial activity").

*Fourth*, and finally, Padagis ignores extrinsic evidence contradicting its construction. Alcon's expert Dr. Jorgensen confirmed that "polyol" refers to a "molecule" with certain structural features. *See* Appx4527 (135:10-23) (also explaining that mannitol refers to a specific molecular structure). Additionally, **before** the district court's order construing the first-polyol term, Alcon's expert Dr. Little explained that the person of ordinary skill in the art ("POSA") would have understood the claims to cover "any amount" of first polyol. Appx1107-1115.

### E. The District Court's "Material Effect" Limitation Is Inconsistent with Precedent.

The district court's claim construction also contradicts this Court's case law. Padagis does not even bother to cite (let alone defend) the grab-bag of irrelevant district court and PTAB decisions that underpinned the court's analysis. *See* Padagis Br. 49; Alcon Br. 35-39. Instead, Padagis attempts to

distinguish the mountain of binding precedent and persuasive authority cited by Alcon, but each of its distinctions falls flat. *See* Padagis Br. 44-49.

1.      As to *SmithKline* and *Abbott*, Padagis has three unpersuasive responses. *First*, Padagis maintains that "[u]nlike *SmithKline*," the claim here "is not 'a compound with an established and unambiguous structural definition,'" but rather a "unique combination of formulation components." Padagis Br. 45 (first quoting *SmithKline*, 403 F.3d at 1339; then quoting Appx132 (1:28-36)); *see also id.* at 47 (same argument concerning *Abbott*). But Padagis fails to explain how the terms "polyol," "mannitol," and "sorbitol" are not unambiguously structural. *See supra* Sections I.A-B. And, as explained before, there is no principled reason that the construction of a structural term should be different if the claim recites just that structure, or if it recites a composition comprising that structure. Nor has this Court treated such claims differently. *See* Alcon Br. 32-35; *see, e.g.*, *ChromaDex*, 59 F.4th at 1281, 1284-85; *Sanders*, 418 F. App'x at 916-18.

*Second*, Padagis argues that, unlike the claims in *SmithKline* (and presumably *Abbott*), the asserted claims "include[] functional elements," namely an "'effective' concentration of borate, which impacts buffering and anti-microbial capability" and is "directly related to the concentration of

mannitol and/or sorbitol." Padagis Br. 45 (quoting Appx133 (4:17-26)). As explained above, however, the "functional elements" in the claim language that Padagis identifies are in fact untethered to the first polyol, *i.e.*, mannitol and/or sorbitol. *See supra* Section I.A.

*Lastly*, Padagis disputes that the district court's decision was affected by policy considerations in the same manner deemed inappropriate in *SmithKline*, claiming that the court properly avoided a construction that "would effectively omit [the first-polyol] 'limitation altogether.'" Padagis Br. 46-47 (quoting Appx29). But there is no need to rewrite the claims to achieve that result. Again, under Alcon's construction, a composition with no mannitol or sorbitol would not infringe, because there would be no first polyol. But a composition with any non-zero amount of mannitol or sorbitol would infringe. *See supra* p. 23. It is Alcon's interpretation that gives effect to all the claim language, without adding an amount limitation that does not exist.

2.     Padagis's cursory treatment of the other cases cited in Alcon's opening brief is no more convincing.

**ChromaDex.** *ChromaDex* embodies the same principles of *SmithKline* and *Abbott*, yet analyzes a claim requiring not just a structural component, but a composition comprising a structural component (specifically, isolated

nicotinamide riboside ("NR")). 59 F.4th at 1281, 1284-85. Padagis claims that that "[u]nlike the '265 patent, trace amounts of [NR] achieved the same functional result as the claimed composition." Padagis Br. 47. In fact, the patentee in *ChromaDex* argued that the "trace amounts" of NR in milk "[wa]s not bioavailable," *i.e.*, that it did not achieve the same functional result as the claim composition. 59 F.4th at 1284-85. Nevertheless, this Court still held that the claims were met by milk. *See id.*

**Sanders.** *Sanders* also shows that the *SmithKline* and *Abbott* rule holds for compositions comprising a structural component (*i.e.*, micronutrients). *See* 418 F. App'x at 916-18. Padagis protests that "[u]nlike the '265 patent, which highlights the concentration-dependent interaction between mannitol/sorbitol and borate to enhance anti-microbial efficacy, *Sanders* identifies no concentration-dependent role for the composition's ingredient." Padagis Br. 48. But Padagis is demonstrably wrong, again. The patentee in *Sanders* amended the claims in a previous patent application to "distinguish [prior art] by adding [the] high-concentration limitation," suggesting a concentration-dependent role for the micronutrients in question. 418 F. App'x at 917.

***Northern Telecom.***  In *Northern Telecom Ltd. v. Samsung Electronics Co.*, this Court analyzed a claim directed to "[a] process for gaseous etching of aluminum and aluminum oxide," and it rejected a construction that it understood to be an attempt at requiring some minimum amount of aluminum to be etched.  215 F.3d 1281, 1283, 1290-91 (Fed. Cir. 2000) (citation omitted). Padagis asserts that "*Northern Telecom* does not indicate that the amount of aluminum played a crucial, concentration-dependent role in the invention." Padagis Br. 48.  But the very purpose of the invention was etching aluminum, which is why Samsung argued that construing the claims to cover etching of "trace" amounts of aluminum would be "absurd" and "nonsensical." *N. Telecom*, 215 F.3d at 1283-84, 1290-91.  This Court roundly rejected that contention.  *Id.* at 1290-91.  The Court should likewise reject Padagis's attempt to ensure that non-trace quantities of first polyol are covered by claims that recite no such requirement, based on similar accusations of supposed absurdity or nonsense.  *See* Padagis Br. 29, 38; *contra AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) (deeming claim language's ordinary meaning nonsensical only because there was a direct "contradiction in terms").

*Sigray.* Addressing a claim directed to an x-ray imaging system comprising a "projection x ray stage" and an "optical stage," *Sigray* construed a limitation requiring "magnification of the projection x ray stage . . . between 1 and 10 times" to include "tiny, even undetectable, magnification." *Sigray, Inc. v. Carl Zeiss X-Ray Microscopy, Inc.*, 137 F.4th 1372, 1375, 1377-80 (Fed. Cir. 2025). Padagis argues that the claims in *Sigray* did not involve "claimed components interact[ing] with each other to provide the 'present invention.'" Padagis Br. 48-49. Again, that is not correct. The invention, and the claims, were directed to two different stages (*i.e.*, components) that interact with each other to generate an enlarged image. *See* 137 F.4th at 1375 (citing U.S. Patent No. 7,400,704 (2:47-49), a present-invention statement discussing the "combin[ation]"). The Court should follow *Sigray* and its precedent, which "repeatedly and consistently has recognized that courts may not redraft claims." *Id.* at 1380 (citation omitted).

## II. The District Court Erred by Finding at Summary Judgment That Padagis's ANDA Does Not Seek Permission To Market a Product Within the Scope of the Claims.

At summary judgment, the district court held that no reasonable factfinder could return a verdict of literal infringement under *Sunovion*, 731 F.3d 1271, on claims 13-19 of the '265 patent and claims 1-3 and 6-23 of the '484

patent. Appx42-50. Unlike the claims at issue above, each of these claims requires, or depends from a claim requiring, between 0.01 w/v % and 0.5 w/v %, or between 0.15 w/v % and 0.5 w/v %, of a "first polyol" (or mannitol). *See* Appx141 (19:15-20:14); Appx128 (17:1-29, 17:34-18:63). The district court's conclusion failed to properly account for the portions of Padagis's ANDA acknowledging that (1) there is a risk of mannitol carryover from another product (the "Brinzolamide ANDA Product") manufactured in the same tank; (2) Padagis allowed for unlimited mannitol carryover into the ANDA Product; and (3) the July 2018 IID's maximum-potency limit for mannitol is 4 w/v %—well above the concentration required by the claims. Padagis's various efforts to defend the district court's misapplication of *Sunovion* lack merit.

## A. The IID Is Not a New Issue.

Unless a generic applicant chooses to provide other evidence of safety, FDA's IID sets limits on the allowable concentrations for certain excipients, including the mannitol that is indisputably present in the Brinzolamide ANDA Product, manufactured in the same tank as the ANDA Product. *See* Alcon Br. 10-15; Padagis Br. 57-58. The district court wrongly determined that "Padagis's ANDA itself does not refer to or incorporate [the IID] database,

nor does it suggest that the ANDA would authorize it to incorporate mannitol in amounts up to that amount." Appx47 & n.7. Padagis asks the Court to refrain from addressing this error, contending that Alcon has "forfeited" any argument that submission of Padagis's ANDA infringes under *Sunovion* based in part on the ANDA's statement about the IID's maximum-potency limit for mannitol. Padagis Br. 55-57. Not so.

A party has not forfeited an argument where "the district court clearly recognized, considered, and ruled on the issue." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 n.2 (Fed Cir. 2014); *see also, e.g.*, *Express Mobile, Inc. v. Meta Platforms, Inc.*, No. 2023-1646, 2025 WL 1693494, at *3 n.3 (Fed. Cir. June 17, 2025) (non-precedential) (similar). That is precisely the case here.

Alcon pointed the court directly to the ANDA document referencing the IID in its summary-judgment briefing. *See* Appx2379 (including citation to Appx2991 (Alcon-Ex. 5 at PADBRI0001204)); *see also* Appx2411 (Little Summary Judgment Decl. ¶ 30) (including citation to Appx2761 (Ex. J at PADBRI0001204, which is a duplicate of Alcon-Ex. 5 at PADBRI0001204)). And the district court understood Alcon to have raised the IID-based argument. In its decision, the court explicitly discussed Dr. Little's

"state[ment] that the FDA [IID] permits the presence of up to 4 w/v percent of mannitol."  Appx47 (citing Appx2411 (Little Summary Judgment Decl. ¶ 30)).  The court further suggested that "[i]f the ANDA in this case had referenced the FDA regulations permitting the presence of up to 4 wt/v percent of mannitol, and if Padagis had acknowledged through expert testimony or otherwise that it was claiming the right . . . under the ANDA to distribute a product containing up to that concentration of mannitol," it would have found infringement.  Appx47 n.7; *see also* Appx3176 (12:8-13) (at hearing, "grappl[ing] with" Alcon's position, "based on the FDA regulations, that [Padagis] could have up to 4 percent, or as a practical matter in this case, given the 300 liter tank, up 3.3. percent mannitol").  These statements clearly demonstrate that the district court "recognized, considered, and ruled" on the IID-based argument (albeit incorrectly).  *Suffolk Techs.*, 752 F.3d at 1364 n.2.  Indeed, Padagis itself acknowledges as much, stating that "the court's summary judgment addressed Little's opinion regarding the IID."  Padagis Br. 62.

Padagis also tries to justify its assertion of forfeiture with a statement from Alcon's counsel at the summary-judgment hearing that its "'entire argument' was based on the ANDA's reference to the possibility of cross-

contamination." Padagis Br. 56 (quoting Appx3205-3206 (41:17-42:15)). But Padagis overreads the hearing exchange. Alcon's counsel agreed only that its argument was "***predicated***" on the "reference to the possibility of some degree of cross-contamination." Appx3206 (42:08–42:15) (emphasis added). Alcon's counsel then explained that there was a genuine dispute as to whether submission of Padagis's ANDA infringes based on the admissions related to cross-contamination ***and*** the fact that "there are a lot of things that the FDA has held are safe[ for] use in pharmaceuticals products," alluding to the IID. Appx3206-3207 (42:15-43:01). That is the same argument Alcon has repeated on appeal.

In any event, this Court retains discretion to consider even forfeited arguments, including where "the issue has been fully briefed, the record is complete, there will be no prejudice to any party, and no purpose is served by remand." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1040 (Fed. Cir. 2017). Here, the Court need not avoid substantively addressing this issue when it already has the benefit of the district court's judgment and Alcon and Padagis have fully briefed the argument on appeal.

**B. A Reasonable Factfinder Could Determine That Padagis's ANDA Seeks Permission To Market a Product Within the Scope of the Claims.**

On the merits, the district court's summary-judgment decision wrongly excused Padagis from the consequences of its own decisions. Padagis decided to reference the IID's maximum-potency limit for mannitol in its ANDA. Appx2761; Appx2991. Padagis decided to manufacture its ANDA Product in a shared tank with the Brinzolamide ANDA Product. Appx2659 (6:12-7:24); Appx2661-2662 (164:12-167:3). And Padagis decided to tell FDA about the shared tank and the amount of mannitol in the Brinzolamide ANDA Product, as well as its choice to permit unlimited mannitol carryover from the Brinzolamide ANDA Product into the ANDA Product. Appx2372-2374; Appx2376-2381; Appx2408-2412 (Little Summary Judgment Decl. ¶¶ 23-32). Those undisputed facts create a genuine dispute as to whether Padagis's ANDA seeks authorization to include mannitol concentrations within the claims' ranges. Padagis's arguments to the contrary reveal a flawed understanding of the facts and the law.[8]

---

[8] Padagis walks away from the district court's suggestion that *Sunovion* is a question of law, conceding that it is a question of fact. *See* Padagis Br. 54-55.

1.     Padagis's primary argument on appeal is that *Ferring B.V. v. Watson Laboratories, Inc.-Florida* (*Ferring I*), 764 F.3d 1382 (Fed. Cir. 2014), and not *Sunovion* and *Par Pharmaceutical, Inc. v. Hospira, Inc.*, 835 F. App'x 578 (Fed. Cir. 2020) (non-precedential), governs here because "Padagis's ANDA makes no representations about the amount of mannitol in the ANDA [P]roduct."  Padagis Br. 59-61.  But that argument simply repeats the district court's reasoning, which was flawed for the reasons explained in Alcon's opening brief.  *See* Alcon Br. 63-67.  More specifically, the statement in Padagis's ANDA about the IID's maximum-potency limit for mannitol— together with the other statements concerning the amount of mannitol in the Brinzolamide ANDA Product and the tolerance for unbounded mannitol carryover into the ANDA Product—would allow a reasonable factfinder to conclude that the ANDA ***does***, in Padagis's words, "identify . . . [a] specific allowable amount of mannitol in the ANDA [P]roduct."  Padagis Br. 60.

Padagis's two substantive responses regarding the IID are similarly unavailing.  *First*, Padagis points out that the July 2018 correspondence with FDA "expressly excluded mannitol from the formulation."  Padagis Br. 62-63.  But that omits half the story.  As Alcon explained in its opening brief, even though Padagis claimed that its proposed formulations did not intentionally

include mannitol in the stated list of ingredients, it still represented that the cited IID permitted up to 4 w/v % of mannitol. *See* Alcon Br. 12 (citing Appx2761 & n.3; Appx3005-3006 (209:1-210:1)). And elsewhere in the ANDA, Padagis admitted that mannitol could in fact be present in the ANDA Product. *See* Appx1589; Appx 2945; Appx2960.

*Second*, Padagis claims that the July 2018 correspondence incorporating the IID is not relevant to the *Sunovion* inquiry because Padagis "merely sought guidance from the FDA on preliminary formulations" rather than on the final "product that [it was] asking the FDA to approve," Padagis Br. 62 (quoting *Sunovion*, 731 F.3d at 1278). To be sure, the correspondence involved preliminary formulations. *See* Alcon Br. 12. But Padagis does not dispute that correspondence is part of the ANDA for this ANDA Product. *See* Alcon Br. 12-13. Nor does Padagis dispute the critical role of the correspondence in conveying to FDA that all the inactive ingredients in its formulations are at or below the IID maximum-potency limits and, thus, safe. *See* Alcon Br. 10-12. Drawing all inferences in favor of Alcon, a reasonable factfinder could conclude that the July 2018 correspondence—in combination with the other documents acknowledging the amount of mannitol in the Brinzolamide ANDA Product

and the risk of carryover—certified that the amount of mannitol ending up in the ANDA Product would be within the scope of the claims.

2. Padagis also repeatedly suggests that no reasonable factfinder could find in Alcon's favor because "Alcon's position is still based on the 'wildly unlikely scenario' that after emptying and cleaning the tank, all of the water-soluble mannitol from the Brinzolamide [ANDA Product] is left behind in the tank to contaminate the ANDA [P]roduct." Padagis Br. 58, 63 (quoting Appx49, where the district court addressed infringement under *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562 (Fed. Cir. 1997), **not** *Sunovion*). That response is a complete non sequitur, betraying a serious misunderstanding of both the *Sunovion* doctrine and Alcon's argument.

Generally, the relevant inquiry for infringement in a Hatch-Waxman case is whether a proposed ANDA product would likely infringe an asserted patent when sold. *See Glaxo*, 110 F.3d at 1567-70 (Fed. Cir. 1997). But there is an exception: A generic applicant's actions infringe when its "ANDA specification defines a [product] such that it meets the limitations of an asserted claim." *Sunovion*, 731 F.3d at 1278-80; *see also Abbott Lab'ys v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). That exception holds even when the generic applicant offers evidence showing, in Padagis's words,

44

its product is "wildly unlikely" to infringe when ultimately marketed. For example, in *Sunovion* itself, the ANDA applicant's internal manufacturing guidelines would have likely kept the product outside the scope of the claims. 731 F.3d at 1278. This Court still found infringement. What mattered were the parameters of the ANDA product on paper rather than in practice. *See id.* at 1278-80 ("What a generic applicant asks for and receives approval to market, if within the scope of a valid claim, is an infringement."); *Par*, 835 F. App'x at 586 ("Even where internal documents suggest that a generic product will not meet a claim limitation in practice, representations about the ANDA's scope control the infringement analysis.").

Here, as in *Sunovion*, it does not matter how likely it is that the ANDA Product will actually contain amounts of mannitol within the scope of the claims' first-polyol concentration range. What matters is whether a reasonable factfinder could determine that the ANDA, as written, seeks approval to market an infringing product. And for the reasons described above, a reasonable factfinder could so find, based on the ANDA's reference to the IID's maximum-potency limit for mannitol and Alcon's expert's calculations determining the amount of mannitol that could carry over consistent with the ANDA's specifications.

## STATEMENT OF THE ISSUE ON CROSS-APPEAL

Whether the district court erred in finding that Padagis failed to prove by clear and convincing evidence that claims 13-19 of the '265 patent were not adequately enabled and would have been obvious.

## STATEMENT OF THE CASE ON CROSS-APPEAL

Padagis challenges the district court's non-obviousness and enablement determinations regarding claims 13-19 of the '265 patent.[9] Claim 13, from which claims 14-19 depend, recites a "multi-dose ophthalmic composition," comprising, among other components, "BAC as an anti-microbial preservative, the concentration of BAC in the composition being greater than 0.00001 w/v % but less than 0.0035 w/v %." Appx141 (19:16-30). The claims further require the composition to be a "suspension." Appx141 (19:34-36). After trial, post-trial briefing, and a post-trial hearing, the district court found that Padagis failed to prove by clear and convincing evidence that these claims were not adequately enabled and would have been obvious.

---

[9] Alcon seeks reversal of the district court's grant of summary judgment of no literal infringement under *Sunovion* of these same claims. Alcon Br. 2. The court also found those claims not infringed under the doctrine of equivalents, but Alcon does not challenge that finding. *Id.* at 22.

As to non-obviousness, the district court conducted a careful survey of the scope and content of the prior art. It found that, although most of the claim limitations were disclosed, the prior art did not disclose compositions with the claims' BAC concentrations. Appx98-104. The district court identified the closest BAC concentration in the prior art for suspensions as 0.01 w/v %. Appx106. But it determined that Padagis did not provide any evidence that the POSA "would have been motivated to reduce the BAC concentration from 0.01 w/v % to 0.0035 w/v % nor that such a person would have expected to have success when making such a large reduction in concentration of BAC." Appx104-107.

As to enablement, Padagis argued that "the claims are not enabled for a BAC concentration of less than 0.001 w/v % because neither the specification nor the prior art provides any guidance on making the claimed product with a concentration of BAC as low as 0.00001 w/v % while retaining its efficacy." Appx114. The district court disagreed, determining that BAC merely had to have "some anti-microbial effect." Appx115; *see also* Appx29921-29923 (64:10-66:11). Given that understanding, the district court found Padagis had not met its burden to prove lack of enablement by clear and convincing evidence. Padagis, the court noted, "ha[d] not argued that it would require

47

undue experimentation to put the claimed components into a formulation at amounts within the claimed ranges, and [it] did not offer any evidence at trial that BAC would cease to have any anti-microbial effect at a very low concentration." Appx115.

## SUMMARY OF ARGUMENT ON CROSS-APPEAL

Padagis's cross-appeal arguments depend on a false premise of inconsistency in the district court's reasoning. On the one hand, Padagis seeks vacatur of the enablement ruling *if* the claims require BAC to meet certain industry standards for preservative efficacy. But, as the district court correctly determined, BAC need only have some anti-microbial effect. On the other hand, Padagis seeks vacatur of the non-obviousness ruling *if* the claims require BAC to have only some anti-microbial effect. But the district court correctly determined that Padagis failed to meet its burden of proof on the key questions of motivation and reasonable expectation of success—and nothing in that analysis reflected an understanding that the claims required BAC to have more than some anti-microbial effect. This Court should affirm the district court's findings regarding enablement and non-obviousness for claims 13-19 of the '265 patent.

# ARGUMENT ON CROSS-APPEAL

## I. Standard of Review

Enablement and obviousness are questions of law based on underlying factual findings. *See* Padagis Br. 64. As the challenger, Padagis bore the burden at trial to prove both enablement and obviousness by clear and convincing evidence, which "has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are highly probable." *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988) (cleaned up). After a trial, the district court's ultimate conclusions of law are reviewed de novo, while the underlying findings of fact are reviewed for clear error. *See* Padagis Br. 65. Under the clear-error standard, this Court defers to the district court's findings "in the absence of a definite and firm conviction that a mistake has been made." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008) (citation omitted).

## II. The District Court's Determination Concerning Enablement Should Be Affirmed.

Padagis argues that vacatur of the enablement determination is required if and only if "the claims are construed to require a composition with sufficient anti-microbial activity to meet efficacy standards." Padagis Br. 74;

*see also id.* at 66 ("The claims require that the composition meet efficacy standards." (capitalization altered)).  As the district court correctly concluded, however, the claims required BAC to have "some anti-microbial effect," but do not additionally require "the formulation to meet a particular level of efficacy, such as the United States and European standards for anti-microbial formulations."  Appx115 (also explaining that BAC did not have to have an "anti-microbial effect . . . sufficient to satisfy the needs of a commercial product").  That conclusion is well supported by the intrinsic record.

1.     Claim 13 and its dependent claims are directed to a "multi-dose ophthalmic composition" that comprises "BAC as an anti-microbial preservative."  Appx141 (19:16, 19:28); *see* Padagis Br. 65, 67-68 (only claim language identified by Padagis).  Nothing in that language requires the composition to have, as Padagis asserts on appeal, "sufficient anti-microbial activity to meet efficacy standards."  Padagis Br. 74.  Instead, the claims require BAC, when included in a composition satisfying the other claim limitations, to merely have some anti-microbial effect, or to provide some prevention of the proliferation of microbes.

The patent's lexicography makes this clear.  As Padagis itself recognized as part of a different claim-construction dispute, the "specification explicitly

defines 'antimicrobial preservative' as 'a chemical agent that prevents the proliferation of microbes in a composition.'" Appx365 & n.5 (quoting Appx120 (1:60-63), or Appx132 (1:62-64) in the '265 patent); *see also* Appx641-642; Padagis Br. 68. In other words, BAC must perform *some* prevention of the proliferation of microbes, *i.e.*, have *some* anti-microbial effect. But there is no requirement that the anti-microbial effect reach any particular level. *See, e.g.*, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249-50 (Fed. Cir. 1998) (explaining that it is improper to "add a narrowing modifier before an otherwise general term that stands unmodified"). Indeed, even Padagis's counsel seemed to share this common-sense understanding at the post-trial hearing. After the district court asked whether Padagis understood the claims to require BAC be "effective enough to meet the standards," Padagis's counsel responded that "BAC has to be a preservative," "[s]o it has to have *some* effect as a preservative in the composition." Appx29921-29922 (64:10-65:7) (emphasis added).

The fact that the preamble recites a "multi-dose ophthalmic composition" likewise does not impose an unstated functional requirement. To the extent the preamble is limiting (which Padagis has not made a developed argument for on appeal), it at most suggests the composition be suitable for

repeated administration to the eye—and thus have some amount of anti-microbial activity. *See, e.g.*, Appx132 (1:56-58) (explaining that "multi-dose" refers to products "utilized multiple times by the patient"); Appx132 (1:59-2:10) (explaining that "[d]ue to the frequent, repeated exposure of multi-dose products to the risk of microbial contamination, it is necessary to employ a means for preventing such contamination from occurring"). The preamble does not require that the composition have enough anti-microbial activity to meet efficacy standards.

Other claims in the '265 patent further support this conclusion. For example, claim 1 of the '265 patent, like claims 13-19, requires "BAC as an anti-microbial preservative," but has a dependent claim that adds only that the composition satisfy specific efficacy standards (Ph. Eur. A, Ph. Eur. B, or both). Appx140 (18:5-23) (claims 1 and 2). That indicates that claim 1, and like it, claims 13-19, do not themselves require that the composition satisfy the "[USP] and analogous guidelines in other countries." Padagis Br. 67 (citation omitted); Appx134-135 (6:50-7:15) (setting forth "preservative efficacy standards for multi-dose ophthalmic solutions in the U.S. and other countries," including USP 27, Ph. Eur. A, and Ph. Eur. B); Appx130 (Abstract) (explaining that "EP and JP" standards are "similar" to "USP preservative efficacy

requirements"); *see, e.g., Phillips*, 415 F.3d at 1314-15 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

The other specification passages Padagis cites do not "clear[ly] and explicitly" support a disclaimer of claim scope. *Thorner*, 669 F.3d at 1365-68. Padagis relies on three present-invention statements, *see* Padagis Br. 67, including one characterizing the compositions as "formulated so as to have sufficient antimicrobial activity to satisfy the preservation efficacy requirements of the [USP] and analogous guidelines in other countries," Appx132 (1:28-32); *see also* Appx130 (Abstract) (similar); Appx134 (6:44-49) (similar). As explained above, however, the "use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Cont'l Cirs.*, 915 F.3d at 798 (cleaned up) (distinguishing *Verizon*, 503 F.3d 1295). Here, the specification provides an express definition of "antimicrobial preservative" that does not incorporate preservation efficacy standards. And, as in *Continental Circuits*, the present invention is also repeatedly described, including in the Summary of Invention section, without reference to

preservation efficacy standards. *See id.*; Appx133 (3:25-40) ("The present invention is directed to a multi-dose ophthalmic composition that includes a first polyol, a second polyol, borate and benzalkonium chloride (BAC)."); Appx133 (3:43-50) (stating that the present-invention ophthalmic composition exhibits "ophthalmic composition that exhibits desired anti-microbial activity and/*or* desired buffering activity" (emphasis added)).

Otherwise, Padagis provides just two additional specification cites. *See* Padagis Br. 68. Specifically, Padagis points to the patent's description of the requirements of one specific preservative standard (*i.e.*, the "USP 27 Antimicrobial Effectiveness Test"). *See* Appx137 (11:21-33). That standard, however, is nowhere referenced in the relevant claims. Padagis also highlights a passage discussing "*[p]rior* multi-dose ophthalmic compositions," and explaining that they "have ***generally*** contained one or more antimicrobial preservatives in order to prevent the proliferation of bacterial, fungi and other microbes." Appx132 (2:1-4) (emphasis added). But that passage does not even refer to the claimed invention. Nor does it suggest those prior compositions met all the preservative efficacy standards Padagis wants to impose on the claims.

Finally, contrary to its assertions, Padagis has not demonstrated that Alcon "treated the claims as if they required meeting preservative efficacy *standards*," such as the USP and analogous guidelines. Padagis Br. 66-67 (emphasis added). The references to "preservative efficacy" that Padagis cites do not indicate that Alcon understood the only possible metric of preservative efficacy to be meeting specific standards, rather than having some anti-microbial effect. *See, e.g.*, Appx29718 (explaining that a "salient question" with respect to obviousness was whether "the prior art . . . provided a reasonable expectation that such a formulation would achieve successful preservative efficacy," but not defining that term to require meeting specific standards).[10] Alcon was merely responding to Padagis's stated theories for invalidity, which sometimes referenced efficacy standards. And in so doing, Alcon even

---

[10] *See also* Appx29755 (explaining that "a suspending agent . . . created significant challenges for the preservative effectiveness of the composition," but not stating that BAC had to meet standards to have preservative effectiveness); Appx29755 (explaining that a suspending agent "results in a need for higher [BAC] concentrations in order to pass preservative efficacy tests" as a "particular" example of how preservative effectiveness could be impacted); Appx29765 (explaining that formulations that "passed other compendial standards" supported enablement, but not stating that satisfying such standards is the only way to show that BAC acts as an anti-microbial preservative).

highlighted that Padagis itself had failed to establish the functional contours of the claims. *See* Appx29763-29765; Appx29796-29797.

2. Applying the correct understanding of claim scope, the district court determined that Padagis had failed to prove lack of enablement by clear and convincing evidence. As the court noted, Padagis "ha[d] not argued that it would require undue experimentation to put the claimed components into a formulation at amounts within the claimed ranges, and [it] did not offer any evidence at trial that BAC [at a very low concentration] would cease to have" the level of efficacy actually required by the claims: "any anti-microbial effect." Appx115. On appeal, Padagis does not dispute that it did not provide any such argument or evidence under that standard. *See* Padagis Br. 70-72, 74 (continuing to make enablement arguments based on BAC satisfying "preservative efficacy requirements," "meet[ing] all preservation efficacy standards," or having "efficacy comparable to a . . . commercial ophthalmic suspension" (citations omitted)). The district court's enablement finding should therefore be affirmed.

## III. The District Court's Determination Concerning Non-Obviousness Should Be Affirmed.

Padagis posits that if the claims do require BAC to have merely some anti-microbial effect, as the district court rightly understood for enablement,

vacatur of the non-obviousness determination is necessary because the court did not apply the same understanding of the claims' scope throughout its analysis of that issue. *See, e.g.*, Padagis Br. 74-75. There is no inconsistency between the district court's enablement and non-obviousness reasoning. On non-obviousness, the district court made three factual determinations: (1) the lowest BAC concentration for a suspension in the prior art Padagis offered at trial was 0.01 w/v %; (2) Padagis did not offer sufficient evidence to demonstrate that the POSA would instead look to solutions with 0.004 w/v % BAC from the prior art; and (3) Padagis offered no evidence that the POSA would have been motivated to, or would have had a reasonable expectation of success of, decreasing BAC from 0.01 w/v %, rather than 0.004 w/v %. In making those findings, the district court never construed or interpreted the claims to require BAC to have more than some anti-microbial effect. *Contra* Padagis Br. 65-66. Instead, the district court correctly identified fatal deficiencies in the obviousness theory Padagis chose to advance at trial. *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016).

1. Because the prior art did not disclose BAC within the claims' concentration range, the district court set out to identify the closest BAC

concentration in the prior art. On that question, the court determined that the POSA would have considered 0.01 w/v % BAC the appropriate starting point. The court reached that conclusion in part because the claims "are addressed to suspensions" and it was undisputed that "the lowest concentration of BAC shown by the prior art for a suspension that was addressed at trial was 0.01 w/v %." Appx105-106 (quoting, *e.g.*, Appx4429 (37:3-9)); *see also, e.g.*, Appx5504-5505 (918:17-919:11); Appx29755 (collecting cites showing that "[o]f the suspensions that [Padagis's expert] did consider in his analysis, none included [BAC] concentrations below 0.01 w/v%").

Padagis claims that this finding "was based on the degree of effectiveness relative to known preservative levels," and thus is inconsistent with the enablement ruling. Padagis Br. 70 (emphasis omitted). But the relevant portion of the district court's opinion has nothing to do with whether the claims require meeting certain levels of preservative efficacy. The court noted that Padagis produced *no* evidence of prior art suspensions with BAC concentrations lower than 0.01 w/v %, period. *See* Appx106. On appeal, Padagis does nothing to challenge the district court's finding of a failure of proof on this issue, pointing to no evidence it produced of prior art suspensions

with less than 0.01 w/v % BAC, at any level of efficacy. That alone makes the district court's identified starting point not clearly erroneous.

2. Instead, Padagis asserts that the district court should have used Padagis's lower proposed starting point of 0.004 w/v %, as was used in two solutions disclosed in U.S. Patent No. 5,505,953 ("Chowhan") (Appx27701-27707). Padagis contends that the district court's two reasons for rejecting this alternative starting point contradicted the enablement ruling. They did not.

*First*, the court found that the POSA would not be motivated to begin with 0.004 w/v % BAC because "there is no indication in Chowhan" that the BAC in those solutions was "effective as an anti-microbial agent." Appx104-105. But that statement, and in particular its use of the word "effective," does not convey an understanding of claim scope contrary to that applied for enablement. *Contra* Padagis Br. 69-70. The court did not say that Chowan needed to disclose that the BAC in its 0.004 w/v % solutions met specific preservative standards to be effective. The problem for Padagis was that a POSA would not look to Chowhan's two 0.004 w/v % BAC solutions because Chowhan does not contain ***any*** testing results or data, including data showing that the BAC in those solutions has ***any*** anti-microbial effect.

*Compare* Appx27703-27704 (4:25-5:65) (solution formulations 9 and 10 with 0.004 w/v % BAC, with no data), *with* Appx27705-27706 (8:30-9:14) (solution formulations A and B with 0.01 w/v % BAC, with data).[11]   As the district court further remarked, this reading of Chowhan is consistent with the testimony presented at trial "point[ing] out . . . there was no efficacy data ***of any type*** reported for those formulations."  Appx105 (emphasis added); *see also* Appx5529 (943:12-944:4); Appx5201 (711:4-10).  Padagis does not identify any error—let alone clear error—in the district court's finding that Chowan lacked any type of data for its 0.004 w/v % BAC solutions, and that this omission would have discouraged the POSA from using those solutions as a starting point.

*Second*, the court provided another, independent reason the POSA would be motivated to reject 0.004 w/v % and choose 0.01 w/v % as a BAC-concentration starting point.  The Chowhan formulations on which Padagis relied were ***solutions***, not ***suspensions***, as required by the claims.  *See* Appx105.   But as the district court noted, Alcon presented unrebutted

---

[11] The district court's opinion contains a minor typographical error, stating that the 0.004 w/v % BAC solutions are in examples 1 and 2.  Appx105.  The solutions are actually in examples 2 and 3.  Appx27703-27704 (4:25-5:65).

testimony that BAC loses about half of its "antimicrobial effectiveness" in suspensions as compared to solutions, due to the molecular interaction between the negatively charged suspending agent and the positively charged BAC. Appx105-107 & n.15; *see also* Appx106 (summarizing testimony showing that a POSA "would expect that more BAC would be needed in a suspension than in a solution to achieve the same anti-microbial effect in a suspension as in a solution"). By contrast, "Padagis offered no contrary evidence . . . about the charge interaction," *i.e.*, presented no contrary evidence demonstrating why a POSA would view solutions and suspensions comparably, and if not comparably, how the efficacy of BAC would be expected to change when moving from solutions to suspensions. Appx106-107.[12]

Again, Padagis suggests that the district court's references to "antimicrobial effectiveness" and "anti-microbial effect" were improper given the enablement ruling. *See* Padagis Br. 70. But again, that does not follow. The district court did not state that it understood the claims to require having

---

[12] The testimony on this point was unrebutted in part because Padagis's expert, Dr. Dyer, was apparently unaware prior to his cross-examination at trial that the Chowhan formulations he was relying upon were solutions, not suspensions. *See* Appx5191-5193 (699:5-701:3). His validity analysis therefore failed to address that fact.

sufficient effect to meet preservative efficacy standards, rather than having any anti-microbial effect. *See* Appx106. The salient point for the district court was that, no matter which metric for effectiveness is used, significantly more BAC is needed to achieve the "same" effect. Appx106; *see also, e.g.*, Appx5510-5511 (924:4-925:8); Appx4453-4454 (61:20-62:9). And given Padagis's lack of evidence regarding how a POSA would modulate BAC levels when going from solutions to suspensions, the district court could reasonably find that, even if a POSA would begin **as Padagis wanted** with Chowhan's solutions containing 0.004 w/v % BAC, the POSA would still conclude that roughly double the amount of BAC was where to start for a suspension. That doubling would land the POSA at about 0.01 w/v %—consistent with the lowest concentration of BAC in prior art suspensions addressed at trial. *See* Appx106-07.

Furthermore, to the extent Padagis contends that, before any doubling, using Chowhan's 0.004 w/v % BAC solutions as a starting point was inappropriate because those solutions, like the 0.01 w/v % BAC suspensions, were chosen "based on the degree of effectiveness relative to known preservative levels," Padagis Br. 70 (emphasis omitted), that is once more a problem of Padagis's own making. **Padagis** decided to rely on those solutions

to try to meet its burden of proof. Tellingly, in its brief, Padagis points to no evidence it produced at trial showing prior art solutions with, for example, 0.002 w/v % BAC, and where BAC had some anti-microbial effect, such that a starting point of 0.004 w/v % BAC for suspensions would be appropriate.

3.    The district court also correctly found that Padagis did not provide any evidence that the POSA "would have been motivated to reduce the BAC concentration from 0.01 w/v % to 0.0035 w/v % nor that such a person would have expected to have success when making such a large reduction in concentration of BAC." Appx107. That reasoning does not contradict the enablement ruling, either: nowhere did the district court indicate that success meant having sufficient anti-microbial activity to meet preservative efficacy standards. To the contrary, the district court's finding hinged on Padagis's failure to adduce any evidence on the key questions of motivation and reasonable expectation of success in reducing BAC's concentration ***from 0.01 w/v %***. *See* Appx107; *see also, e.g.*, Appx5147-5149 (655:7-657:9); Appx5155-5156 (663:23-664:8).

On appeal, Padagis does nothing to rectify the deficiency identified by the district court. It points to no evidence showing that the POSA would have

been motivated to reduce the BAC concentration from 0.01 w/v % to 0.0035 w/v %, and would have reasonably expected success in doing so, even if success means reasonably expecting that BAC would have some anti-microbial effect. *See* Padagis Br. 72-73 (instead highlighting the other findings the district court made in Padagis's favor in its non-obviousness analysis). That is because Padagis chose to rely upon motivation and reasonable-expectation-of-success evidence predicated on the faulty assumption that the starting point for the BAC concentration from the prior art was 0.004 w/v %, not 0.01 w/v %. *See* Appx107. Padagis must live with that choice.

4. Unable to locate an explicit tension, Padagis finally retreats to claiming that there is implicit tension between the non-obviousness and enablement analyses because (1) "for the prior art, the court found that a three-fold difference in the prior art BAC concentration at the high end of the claimed range (0.01 versus 0.0035 w/v%) was 'a large reduction' with no expectation of success," whereas (2) "the court concluded that the hundred-fold difference between the examples in the specification and the bottom of the claimed range posed no concern because it was 'reasonable to conclude that BAC has some anti-microbial effect at the low end of the claimed concentration

range.'"  Padagis Br. 73-74 (first quoting Appx107; then quoting Appx115). There is no tension.

As an initial matter, Padagis once again elides the fact that the district court's reasoning was based on Padagis's own evidentiary failures. As part of the non-obviousness analysis, the court found that Padagis did not produce any evidence from which it could be determined that, when decreasing BAC from 0.01 w/v % to 0.0035 w/v %, the POSA would maintain a reasonable expectation that BAC would continue to act as an anti-microbial preservative. That was because all the evidence Padagis did produce concerned a much smaller decrease. *See* Appx107. As part of the enablement analysis, the court found that Padagis did not produce any evidence from which it could be determined that, when decreasing BAC from 0.001 w/v % to 0.00001 w/v %, BAC would cease to act as an anti-microbial preservative. That was because all the evidence Padagis did produce concerned whether BAC would cease to meet higher preservative efficacy standards. *See* Appx114-115. There is no inconsistency in finding that Padagis failed to introduce evidence regarding how the anti-microbial effect would be expected to change over these different BAC ranges.

In any event, the substantive comparison Padagis seeks to draw conflates the distinct standards for obviousness and enablement. "The obviousness inquiry turns on what the prior art would have taught a [POSA] and whether the claimed invention would have been obvious in view of the *prior art*." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1310 (Fed. Cir. 2015). "In contrast, the enablement inquiry turns on whether the [POSA], after reading the *specification*, would be able to make and use the claimed invention without undue experimentation, based on the ordinary skill in the art." *Id.* Accordingly, where the specification "provide[s] sufficient guidance to the [POSA], there is no tension in [a] district court's decision that the asserted claims would not have been obvious and also are not invalid for lack of enablement." *Id.*

The same is true here. Padagis protests that "the prior art teachings [are not] different from the patent in a way that justifies the court's differing approach," citing to findings and evidence concerning the optimization of borate and polyol concentrations. Padagis Br. 71, 73-74 (citing, *e.g.*, Appx103-104, Appx27703 (3:8-12)). But in making that assertion, Padagis completely ignores the major way that *even it admits* the specification advanced the prior art: by demonstrating the "successful[] use[]" of BAC as

an anti-microbial preservative not just at 0.01 w/v %, or even 0.0035 w/v %, but 0.001 w/v %. Padagis Br. 70.

Keeping that difference in mind, the findings of non-obviousness and enablement are completely reconcilable. On the one hand, as part of obviousness, the court determined that a POSA might not have a reasonable expectation of producing suspensions where BAC acted as an anti-microbial preservative when decreasing BAC's concentration from ***the prior art's*** 0.01 w/v % to 0.0035 w/v % (*i.e.*, a 0.0065 absolute-value reduction). *See* Appx107; *see also, e.g.*, Appx4730 (338:11-19); Appx5529-5531 (943:12-945:7); Padagis Br. 71 (collecting cites from Alcon's witnesses explaining why, based on the prior art, it was surprising the inventors were able to formulate suspensions with BAC at the claimed concentrations). On the other hand, as part of enablement, the court determined that BAC might continue to act as an anti-microbial preservative when decreased from ***the specification's*** 0.001 w/v % to 0.00001 w/v % (*i.e.*, a 0.00099 absolute-value reduction). Appx114-115; *see also, e.g.*, Appx5570-5575 (984:19-989:2). Put differently, while a POSA could have had serious qualms about dropping BAC below 0.01 w/v % when armed with only the prior art, there could have been no undue experimentation in effectuating a smaller drop from 0.001 w/v %

once armed with the admitted advances that the specification provided over the prior art. Padagis, not the district court, had the onus to prove that was not the case and it did not do so.

## CONCLUSION

As to the appeal, Alcon respectfully requests that this Court vacate the district court's judgment of noninfringement for claims 1-3 and 6-19 of the '265 patent and claims 1-3 and 6-23 of the '484 patent and remand the case for further proceedings, based on the reversal of the claim construction concerning claims 1-3 and 6-12 of the '265 patent and reversal of the grant of summary judgment of no literal infringement on claims 13-19 of the '265 patent and claims 1-3 and 6-23 of the '484 patent. As to the cross-appeal, Alcon respectfully requests that this Court affirm the judgment of no invalidity for claims 13-19 of the '265 patent.

Respectfully submitted,

/s/ Charles McCloud
DAVID I. BERL
CHRISTOPHER J. MANDERNACH
ANDREW V. TRASK
CHARLES MCCLOUD
  *Principal Counsel*
ADAM PAN
CHRISTIE CORN
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue, S.W.*
  *Washington, DC 20024*
  *(202) 434-5000*

*Attorneys for Plaintiffs-Appellants*

DECEMBER 1, 2025

## CERTIFICATE OF SERVICE

I certify that today, December 1, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel of record for all parties will be served by the appellate CM/ECF system.

DECEMBER 1, 2025

/s/ Charles McCloud
CHARLES MCCLOUD

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH
## TYPEFACE LIMITATION AND WORD COUNT

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(1).  This brief contains 13,965 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point CenturyExpd BT style.

DECEMBER 1, 2025

/s/ Charles McCloud
CHARLES MCCLOUD

*Attorney for Plaintiffs-Appellants*