IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

ALCON INC., ALCON VISION, LLC,
ALCON LABORATORIES, INC.,
*Plaintiffs-Appellants,*

*v.*

PADAGIS ISRAEL PHARMACEUTICALS LTD.,
PADAGIS LLC, PADAGIS US LLC,
*Defendants-Cross Appellants,*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE
CASE NO. 1:22-cv-01422-WCB, Judge William C. Bryson

## DEFENDANTS-CROSS APPELLANTS PADAGIS ISRAEL PHARMACEUTICALS LTD., PADAGIS LLC, AND PADAGIS US LLC'S REPLY BRIEF

Carol Pitzel Cruz, *Principal Counsel*
KNOBBE, MARTENS, OLSON & BEAR, LLP
555 110th Avenue NE, Suite 500
Bellevue, WA 98004
206-405-2000

William Zimmerman
Andrea Cheek
Aryeh Feinstein
KNOBBE, MARTENS, OLSON & BEAR, LLP
1717 Pennsylvania Ave., NW, Suite 900
Washington, D.C. 20006
(949) 760-0404

Jeremiah Helm
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA 92614

*Attorneys for Defendants-Cross Appellants
Padagis Israel Pharmaceuticals Ltd., Padagis
LLC, and Padagis US LLC*

January 29, 2026

# CERTIFICATE OF INTEREST

Counsel for Defendants-Cross-Appellants Padagis Israel Pharmaceuticals Ltd., Padagis LLC and Padagis US LLC certifies the following:

1.      The full name of every party represented by me is:

Padagis Israel Pharmaceuticals Ltd., Padagis LLC and Padagis US LLC

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Padagis Israel Pharmaceuticals Ltd. is wholly owned by Padagis LLC. Padagis US LLC is wholly owned by Padagis LLC. Padagis LLC has no parent corporation. There are no publicly held companies that own 10% or more stock of in these entitties.

4.      The name of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

Jared C. Bunker and Jonathan E. Bachand of Knobbe, Martens, Olson & Bear, LLP. Andrew E. Morrell, Purna Chandrasekhar, and Nyja Prior formerly of Knobbe Martens Olson & Bear LLP. John C. Phillips, Jr., Megan C. Haney, David A. Bilson of Phillips McLaughlin & Hall, P.A.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

6.      Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: January 29, 2026     By: /s/ *Carol Pitzel Cruz*

Carol Pitzel Cruz, *Principal Counsel*
William Zimmerman
Andrea Cheek
Jeremiah Helm
Aryeh Feinstein


*Attorneys for Defendants-Cross Appellants*
*Padagis Israel Pharmaceuticals Ltd., Padagis*
*LLC, and Padagis US LLC*

**TABLE OF CONTENTS**

Page No.

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

    A.    Claim Construction.............................................................................2

    B.    Obviousness.....................................................................................13

    C.    Enablement ......................................................................................19

CONCLUSION ...................................................................................................23

CERTIFICATE OF COMPLIANCE....................................................................26

# TABLE OF AUTHORITIES

**Page No(s).**

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ..............................................................13, 15, 19

*Brita LP v. Int'l Trade Comm'n*,
  156 F.4th 1326 (Fed. Cir. 2025) .................................................................22, 23

*Continental Circuits LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..........................................................................9

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) .........................................................................3

*Poly-America, LP v. API Indus., Inc.*,
  839 F.3d 1131 (Fed. Cir. 2016) ....................................................................8, 9

*Toro Co. v. White Consol. Indus., Inc.*,
  199 F.3d 1295 (Fed. Cir. 1999) .........................................................................8

## OTHER AUTHORITIES

35 U.S.C. § 112 ......................................................................................................21

# INTRODUCTION

Alcon reduces the patent's invention to an afterthought. It is of no moment to Alcon that the specification insists that multi-dose ophthalmic compositions must have adequate preservation efficacy to serve their purpose. Nor does Alcon care for the specification's repeated explanation that the "***present invention*** is directed to pharmaceutical compositions formulated so as to have sufficient antimicrobial activity to ***satisfy the preservation efficacy requirements*** of the United States Pharmacopeia ('USP') and analogous guidelines in other countries." Appx132 1:28-36.[1] Instead, Alcon insists that the claims should be interpreted to encompass formulations with merely "some" undefined preservation effect, no matter how small. The patent, however, makes clear that such compositions are not the claimed multi-dose ophthalmic compositions.

Padagis takes the patent at its word that the invention is (1) a composition that has sufficient antimicrobial activity to meet preservation efficacy requirements such as the USP; and (2) accomplishes that goal by using an allegedly "unique combination of formulation components and particularly the use of two or more different polyols in combination with borate and a preservative, particularly BAC." Appx132 1:28-36. Padagis's understanding of the claims, like the "present invention" described in the specification, requires the claimed multi-dose

_____

[1] All emphasis added unless noted.

ophthalmic compositions have sufficient preservation efficacy to meet one of the known standards.

Regardless, a consistent construction must be applied when assessing both obviousness and enablement. Padagis explained to the district court that Alcon's arguments against obviousness, which focused on preservation efficacy standards, undermined the claims' enablement. Appx29671-73; Appx29703-05. The district court's obviousness analysis treated the claims as if they required achieving the same preservation efficacy as prior art commercial formulations and, despite finding a motivation to reduce BAC concentration, concluded there was no reasonable expectation of success in doing so. Appx101-07. For enablement, however, the district court construed the claims to require only that BAC have some level of anti-microbial effect, even if negligible, as long as BAC's effect did not "cease" entirely. Appx115. This Court should construe the claims, and remand for analysis of obviousness and enablement under the same, consistent construction.

## ARGUMENT

### A. Claim Construction

The claimed multi-dose ophthalmic compositions all require "BAC as an anti-microbial preservative." Alcon argues that limitation merely reminds the reader that BAC, a ubiquitous anti-microbial agent known to be "desirable as a preservative in conjunction with a wide variety of therapeutic agents," (Appx132 2:32-35) has anti-

microbial properties. Thus, according to Alcon, "the claims require BAC, when included in a composition satisfying the other claim limitations, to merely have some anti-microbial effect, or to provide some prevention of the proliferation of microbes." Reply 50. Alcon's understanding conflicts with the claim language and specification.

Alcon concedes, as it must, that "BAC as an anti-microbial preservative" imposes a functional requirement for BAC in the composition. Reply 50. But Alcon's understanding is that the function need not have any practical effect, nor even an observable effect. *Id*. That interpretation effectively eliminates the requirement of "BAC as an anti-microbial preservative" from the claims because it needlessly recites a well-known property of BAC, that it could potentially have "some" anti-microbial effect, without imposing any other limitation. Appx132 2:32-45. A "claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Merck & Co. v. Teva Pharms. USA, Inc*., 395 F.3d 1364, 1372 (Fed. Cir. 2005). Here, the claimed concentration of BAC, in combination with the other claimed ingredients, must provide sufficient preservation to allow the formulation to be used as a "multi-dose ophthalmic composition" because that claimed composition is "substantially free of any preservatives other than benzalkonium chloride." Appx141.

The specification is replete with definitional statements confirming that "BAC as an anti-microbial preservative" must achieve sufficient levels of preservation to meet efficacy standards and prevent contamination of a multi-dose ophthalmic composition. At the outset, the specification indicates that the "present invention is directed to pharmaceutical compositions formulated so as to have sufficient antimicrobial activity to satisfy the preservation efficacy requirements of the United States Pharmacopeia ('USP') and analogous guidelines in other countries." Appx132 1:28-32.

According to the patent, the way the compositions of the "present invention" "achieve preservation" sufficient to meet compendial standards is by using an allegedly "***unique combination*** of formulation components and particularly the use of two or more different polyols in combination with borate and a preservative, particularly BAC." Appx132 1:28-36. The patent thus also dictates how the compositions of the "present invention" meet a preservative efficacy standard: by using the "unique combination of formulation components," including two different polyols, borate, and a preservative, "particularly BAC." Appx132 1:28-36.

Interpreting the claim as Alcon proposes makes the invention illusory. The patent explains that the "present invention is ***predicated upon*** the provision of two or more different polyols in the presence of borate and benzalkonium chloride (BAC) for providing a pharmaceutical composition and particularly an ophthalmic

- 4 -

composition that exhibits desired anti-microbial activity and/or desired buffering activity." Appx133 3:43-48. Using that allegedly "unique combination" to enhance a miniscule amount of BAC, only to obtain an undefined, negligible anti-microbial effect in the composition, does nothing to address the "risk of microbial contamination" that makes it "necessary" to use the anti-microbial agent in the multi-dose ophthalmic composition in the first place. Appx132 1:59-67.

The patent deems it not just desirable, but "necessary," to prevent "microbial contamination" in multi-dose compositions, specifically with "a chemical agent that prevents the proliferation of microbes in a composition, which is referred to herein as an 'antimicrobial preservative.'" Appx132 1:59-67. The specification distinguishes and criticizes formulations that include anti-microbial agents at concentrations that do not preserve compositions to the required standards. For example, the patent explains that "lower concentrations" of an anti-microbial preservative "may be insufficient to achieve the required level of biocidal efficacy (i.e., antimicrobial preservation)." Appx132 2:17-23. The use of "i.e." is a definitional statement that confirms "BAC as an anti-microbial preservative" in the composition must "achieve the required level of biocidal efficacy," and not merely "some" effect, as Alcon proposes.

Killing some microbes is not enough because, for multi-dose ophthalmic formulations like those claimed, antimicrobial preservation necessitates meeting the

"required level of biocidal efficacy." Appx132 2:17-23. Accordingly, the patent confirms, yet again, that "[t]he present invention is particularly directed to the provision of *multi-dose ophthalmic compositions* that have sufficient antimicrobial activity to allow the compositions to satisfy the USP *preservative efficacy requirements*, as well as other preservative efficacy standards for aqueous pharmaceutical compositions." Appx134 6:44-49. And the Abstract likewise confirms: "The present invention is directed to the provision of *multi-dose, ophthalmic compositions*. The compositions *possess sufficient antimicrobial activity* to satisfy USP *preservative efficacy requirements*, as well as similar preservative standards (e.g., EP and JP)." Appx130.

Alcon claims the patent's lexicography requires only that "BAC must perform *some* prevention of the proliferation of microbes, *i.e.*, have *some* anti-microbial effect," but "there is no requirement that the anti-microbial effect reach any particular level." Reply 50-51 (emphasis in original). When the patent requires that an "antimicrobial preservative" "prevents the proliferation of microbes in a composition" (Appx132 1:62-64) it means what it says: that proliferation is prevented, not merely reduced by "some" undefined and negligible amount as Alcon would have it. The specification identifies and reproduces preservation efficacy standards that apply to the "present invention" as the way to assess whether the composition has "sufficient antimicrobial activity." Appx134-35 6:44-7:18.

Alcon argues that the "express definition of 'antimicrobial preservative,'" at Appx132 1:62-65, "does not incorporate preservation efficacy standards." Reply 53-54. But the immediately preceding disclosure emphasizes that "some" prevention is not enough because in multi-dose compositions "it is ***necessary*** to employ means for preventing such contamination from occurring." Appx132 1:59-62. Ophthalmic compositions "are required to be sterile," but the sterility of multi-dose products "may be compromised" by exposure to "sources of potential microbial contamination." Appx132 1:37-58. Thus, the specification explains "antimicrobial preservation" requires "achiev[ing] the ***required*** level of biocidal efficacy." Appx132 2:17-21.

That is why the patent consistently links the "present invention" of a multi-dose ophthalmic composition as a whole to the ability to meet "preservative efficacy requirements." Appx130 (Abstract); Appx132 1:28-32; Appx134 6:44-49. These preservative efficacy standards define the "required level of biocidal efficacy" and determine whether the "necessary…means for preventing…contamination from occurring" are effective to "prevent[] the proliferation of microbes." Appx132 1:59-67, 2:17-21; *see also* Appx134-35 6:44-7:18 (setting out standards used to assess "sufficient antimicrobial activity" in the "present invention"). Such repeated characterization of the "present invention" as a composition requiring sufficient antimicrobial preservation, coupled with disparagement of "the absence of [the]

feature," serves to define the scope of the claims. *Poly-America, LP v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016); *see also* Appx135 8:60-64 ("Notably, ***prior to the present invention***, relatively high concentrations of benzalkonium chloride were typically needed to preserve anionic polymer based suspensions as well as other ophthalmic compositions to Ph. Eur B or Ph. Eur. A criteria."); *see also* Appx132 2:40-45 ("desirable to develop a preservative system that can enhance the anti-microbial effects of low concentrations of BAC"); Appx133 3:18-23 ("particularly desirable to provide an ophthalmic composition" that "includes low concentrations of BAC while exhibiting improved anti-microbial activity….").

Alcon cites dependent claim 2 and argues that claim differentiation requires untethering "BAC as an antimicrobial preservative" from the ability to preserve the multi-dose composition and prevent contamination from occurring, as measured by efficacy standards. Reply 52-53. Claim differentiation is a presumption that there is "a difference in meaning and scope when different words or phrases are used in separate claims" and prevents situations where "the absence of such difference in meaning and scope would make a claim superfluous." *Toro Co. v. White Consol. Indus., Inc*., 199 F.3d 1295, 1302 (Fed. Cir. 1999). No such conflict exists here.

Claim 2 narrows the preservative efficacy of claim 1 and requires it to meet the "Ph. Eur. A" and/or "Ph. Eur. B" standards, which include more stringent efficacy requirements (Appx134-35 6:50-7:15; Appx137 11:4-20; Appx 29730

(*citing* Appx4587 195:8-15)). The "present invention," in contrast, includes compositions with "sufficient antimicrobial activity" to satisfy one of the known "preservative efficacy standards for multi-dose ophthalmic solutions," including the "USP 27", "Japan, "Ph. Eur. A", " Ph. Eur. B", or "FDA/ISO 14730" standards set out in the specification. Appx134-35 6:44-7:15. Claim 2's limitation is not superfluous and instead narrows the scope of the claim to just two specific efficacy tests. Regardless, "claim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole, and it cannot override clear statements of claim scope found in the specification." *Poly-America*, 839 F.3d at 1137.

Alcon analogizes this situation to *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019), and argues that the "present invention is also repeatedly described…without reference to preservation efficacy standards." Reply 53-54. In *Continental Circuits*, however, the reference to the "present invention" "appear[ed] within the discussion of the preferred embodiment." 915 F.3d at 798. Accordingly, the Court held those references to the "present invention" "do not characterize the present invention 'as a whole.'" *Id*. In contrast, as discussed, here the patent characterizes the present invention as a whole, repeatedly indicating that multi-dose ophthalmic compositions must satisfy "preservative efficacy requirements" or "standards" and "achieve the required level of biocidal efficacy." *See, e.g.*, Appx132 1:28-2:23. The patent's examples likewise "illustrate the

antimicrobial activity and/or preservative efficacy of the ophthalmic compositions of the present invention containing the combination of two different polyols" via efficacy testing. Appx137 12:13-19; *see generally* Appx137-139 col.12-16.

Alcon's citations, which break up a contiguous disclosure in the specification (Reply 54, citing Appx133 3:25-40 & 3:43-50), are not to the contrary. The purpose of using two different polyols, borate, and BAC in the present invention (Appx133 3:25-40) is "to achieve preservation" that "satisf[ies] the preservative efficacy requirements" of various compendial standards (Appx132 1:28-36). Alcon's second citation, which indicates the "present invention" is "an ophthalmic composition that exhibits desired anti-microbial activity and/or desired buffering activity," Appx133 3:43-50, supports Padagis's construction. The independent claims are to ophthalmic compositions with "BAC as an anti-microbial preservative," but do not mention buffering. Thus, the claimed invention is an "ophthalmic composition that exhibits desired anti-microbial activity." Appx133 3:43-50. Dependent claim 14 adds a limitation related to buffering. *See* Appx141 ( "resistance…to normalization of tear pH"). For claim 14, the invention is an "ophthalmic composition that exhibits *desired anti-microbial activity and*/or *desired buffering activity*." Appx133 3:43-50. But no claim is directed to only buffering properties.

Alcon's claim construction arguments walk-back many of its previous positions. For example, Alcon insinuates that the preamble is not limiting and

suggests Padagis had to make "a developed argument" establishing the claims are directed to multi-dose ophthalmic compositions. Reply 51-52. Alcon took the opposite position at the district court:

- "The Asserted Claims at issue in this case are directed to ***multi-dose ophthalmic compositions***." (Appx29719)

- "the first polyol is necessary to ensure that the preservative efficacy of the ***claimed multi-dose ophthalmic compositions*** is sufficient with the low BAK concentrations" (Appx29725)

- "***claimed multi-dose compositions*** that include two polyols and borate" (Appx29758)

- "***claimed multi-dose composition***" (Appx29760)

Likewise, Alcon argues for some amorphous other "possible metric of preservative efficacy" without ever explaining what that might be. Reply 55-56. Indeed, Alcon suggests that the claim requires merely "***any*** anti-microbial effect," Reply 56, no matter how small. Of course, as the specification explains, "any anti-microbial effect" is insufficient for a multi-dose ophthalmic composition because "lower concentrations [of anti-microbial agent] may be insufficient to achieve the required level of biocidal efficacy (i.e., antimicrobial preservation)." Appx132 2:17-21. The patent explains the metrics used to assess whether a multi-dose ophthalmic composition has adequate preservation are compendial standards such as the USP.

*See, e.g.*, Appx132 1:28-2:23; Appx134-35 6:44-7:15; Appx137 12:13-19; *see generally* Appx137-139 col. 12-16. Alcon, as well as its expert and inventor, confirmed that "[p]reservative efficacy is measured using standard compendial methods that help microbiologists assess the ability of a particular composition to inhibit the proliferation of microbes." Appx29730 (*citing* Appx4586 194:17-24; Appx4415 23:19-24:16).

Alcon also suggests that when it argued that the claims were non-obvious, it "was merely responding to Padagis's stated theories for invalidity, which sometimes referenced efficacy standards." Reply 55. That is incorrect. Alcon distinguished the prior art based on the theory that "without PET [preservative efficacy testing] data, it is impossible to know whether the [prior art] formulations provide ***adequate preservative efficacy to be used as a multi-dose ophthalmic composition***." Appx29743. One of Alcon's central arguments regarding obviousness, ultimately adopted by the district court, was that in suspensions, "the interaction with BAK, though it does not render BAK fully ineffective, results in a need for higher BAK concentrations ***in order to pass preservative efficacy tests***." Appx29755.

At the district court, Alcon argued that "the salient question" for obviousness was, *inter alia*, whether the prior art formulations "provided a reasonable expectation that such a formulation would achieve ***successful preservative efficacy***." Appx29718. The expectation of success analysis is based on the "appropriate scope

of the…claimed invention" and applying the wrong scope "constitutes a legal error."

*Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 966 (Fed. Cir. 2014). Alcon's arguments

at the district court that the expectation of success requires "successful preservation

efficacy" mirror the specification, but conflict with its arguments on appeal

suggesting that "some" undefined effect is all the claims require.

Padagis's position is straightforward: the patent means what it says, and the

claims would be useless unless the claimed multi-dose ophthalmic compositions

meet the required preservation efficacy of any of the preservation efficacy standards,

*e.g.*, those disclosed in the specification, using the claimed range of BAC. As

Padagis explained to the district court, that same claim scope must be applied to

obviousness and enablement. Appx29922-23 65:8-66:11; Appx29924-25, 67:6-

68:8.

## B.  <u>Obviousness</u>

Alcon argues that the district court's obviousness holding must be affirmed

because, according to Alcon, "the district court never construed or interpreted the

claims to require BAC to have more than some anti-microbial effect." Reply 57.

That is incorrect. The district court's obviousness decision rests on the

understanding that the claims require sufficient efficacy to be used as a multi-dose

ophthalmic composition, consistent with prior art commercial formulations meeting

preservative efficacy standards.

As an initial point, the district court made a series of findings, which Alcon does not contest, related to the prior art. As set out in Padagis's opening brief, Alcon's own prior art discloses: (1) combining BAC with borate-polyol complexes to enhance antimicrobial efficacy (Appx101-02); (2) a suggestion "to overcome BAC's drawbacks by enhancing its effectiveness so that it can be used at lower, less toxic concentrations" (Appx102); (3) that the prior art disclosed the claimed concentrations of borate and polyols and that the "optimum amounts" of borate and polyol could "readily be determined" by an artisan (Appx103-04); and (4) that evidence of secondary considerations was "not particularly compelling" (Appx113). The district court thus found a motivation to decrease the amount of BAC in a formulation and that such optimization was routine.

The barrier to obviousness set out in the district court's opinion was that the prior art's example suspensions that used BAC did so at 0.01 w/v %, and not at 0.0035 w/v% as claimed. Alcon argues that the district court correctly determined that "0.01 w/v % BAC" was the "appropriate starting point" for a suspension. Alcon deems it a "failure of proof" that there are no "prior art suspensions with BAC concentrations lower than 0.01 w/v %." Reply 58. Alcon argues that obviousness requires "evidence…of prior art suspensions with less than 0.01 w/v % BAC, at any level of efficacy." Reply 58-59. The law, however, "does not require absolute predictability of success" and instead requires only that the prior art "gives direction

as to what parameters are critical and which of many possible choices may be successful." *Allergan*, 754 F.3d at 965 (cleaned up).

The prior art suspensions with 0.01 w/v % BAC cited by Alcon and the court are commercial formulations that exceeded preservative efficacy testing standards without the anti-microbial enhancement of borate-polyol complexes. *See, e.g.,* Appx29641, Appx29759. The district court found that optimization of borate-polyol complexes, and its concomitant increase in BAC efficacy, was routine. Appx103-04. The district court further found the prior art suggested using formulations with borate-polyol complexes to reduce the amount of BAC in a composition. Appx101-02. Unless the claims require that the composition meet specific preservative efficacy standards, there is no basis to require evidence of efficacy.

Alcon discounts the Chowhan prior art, which included 0.004 w/v % BAC solutions, arguing that it "does not contain ***any*** testing results or data, including data showing that the BAC in those solutions has any anti-microbial effect." Reply 59-60 (emphasis in original). Again, this misunderstands the state of the art. Prior art commercial products typically included BAC at concentrations ranging from, *e.g.*, 0.004 to 0.01 w/v %. Appx29641 (*citing* Appx5121 629:8-24, Appx5122-25 630:17-633:10, Appx5373-74 787:18-788:6; Appx6527; Appx6514; Appx6515-18); Appx29759 (Alcon: "BAK was typically used at a concentration between 0.004% and 0.01 w/v%"). The 0.004 w/v % BAC in Chowhan was the same

concentration effectively and successfully used in prior art commercial products, which did not include the borate-polyol complexes that Chowhan taught further enhanced BAC's anti-microbial activity. Even if Chowhan did not include "testing results or data," Reply 59-60, it was well-known that multi-dose ophthalmic formulations that included BAC at 0.004 w/v % had an anti-microbial effect sufficient for FDA approval and commercial marketing.

Nor did the district court find that the absence of efficacy data for Chowhan's formulations "would have discouraged the POSA from using those solutions as a starting point," as Alcon asserts. Reply 60. Instead, the court required efficacy testing data to demonstrate that the BAC "was effective as an anti-microbial agent," Appx105, which is relevant only if the claims require BAC meet efficacy testing standards.

Likewise, Alcon argues that BAC "loses about half of its 'antimicrobial effectiveness' in suspensions as compared to solutions." Reply 60-61. Alcon further argues that "[t]he salient point for the district court was that, no matter which metric for effectiveness is used, significantly more BAC is needed to achieve the 'same' effect." Reply 61-62. But, again, the need for "more BAC…to achieve the 'same' effect" is only relevant if the claims require meeting some defined level of anti-microbial efficacy. Otherwise, finding that efficacy would be reduced by half leads to the necessary conclusion that some anti-microbial effect remains (indeed,

definitionally, half of the original level that was sufficient for a commercial multi-dose ophthalmic product).  *See also* Appx29755 (Alcon:  suspension "does not render BAK fully ineffective").  The scope of the claim that the court applied in its enablement analysis, however, required merely that BAC have "any anti-microbial effect." Appx115.

Alcon suggests that the district court "correctly found that Padagis did not provide any evidence that the POSA 'would have been motivated to reduce the BAC concentration from 0.01 w/v % to 0.0035 w/v % nor that such a person would have expected to have success when making such a large reduction in concentration of BAC.'"  Reply 63.  But, as the court found, Padagis provided evidence of a motivation to reduce the concentration of BAC to avoid side effects and to do so by using borate-polyol complexes that enhanced BAC's effectiveness, with the "optimum amounts" readily determined by a skilled artisan.  Appx103-04.

Indeed, there was no real dispute on that issue because Alcon's expert admitted that it would have been routine to optimize the concentration of BAC in a composition and determine the lowest BAC concentration that provided adequate preservation efficacy.  Appx5628-30 1042:15-1044:15; Appx29665-66.  Padagis's expert confirmed that the prior art: (1) taught formulations with borate-polyol complexes increase the antimicrobial activity of a preservative, including BAC; and (2) explained that the prior art's teaching of enhanced BAC activity with borate-

polyol complexes would provide an expectation that BAC could be used at the claimed concentrations. Appx5138 646:5-15 (discussing Appx27701, Abstract: borate-polyol complexes "increase the antimicrobial efficacy of other antimicrobial agents when used in combination"); Appx5150-51 658:22-659:24 (discussing Appx27689: "One approach to enhancing the anti-microbial activity" of ophthalmic compositions is to use "[b]orate buffer systems in combination with one or more polyols, such as mannitol," which "aid the anti-microbial activity of compositions…."); Appx5153-56 661:19-664:8 (*citing* Appx27702 1:44-50, 2:13-21); *see also* Appx27703 3:8-12 (optimum amount of formulation components "can be readily determined by one skilled in the formulary arts").

Finally, Alcon argues that "nowhere did the district court indicate that success meant having sufficient anti-microbial activity to meet preservative efficacy standards." Reply 63. At trial, however, Alcon took the position that the "salient question" was whether the prior art formulations "provided a reasonable expectation that such a formulation would achieve ***successful preservative efficacy***." Appx29718. The district court found a motivation to reduce the concentration of BAC in a composition when it also includes borate and polyols. Appx102. Indeed, the court found that "Alcon does not dispute that a person of ordinary skill would be motivated to reduce the concentration of BAC." Appx104.

The court further found that the prior art disclosed that optimizing formulations that included borate-polyol complexes was "readily" done by a skilled artisan. Appx103-04. The specification admits that formulations are made using "procedures that are well-known to persons of ordinary skill." Appx136 10:49-53. And, though the court found a suspension reduced BAC's efficacy, it is only by half, which necessarily means that BAC maintains efficacy at the known concentrations, even if it is reduced. Appx106-07; Appx29755. Thus, the only barrier with respect to the expectation of success is meeting a particular anti-microbial efficacy standard, which is consistent with the court's analysis comparing the claimed BAC concentration to the BAC concentration used in prior art commercial suspension formulations.

The "failure to consider the appropriate scope of the…patent's claimed invention in evaluating the reasonable expectation of success…constitutes a legal error." *Allergan*, 754 F.3d at 966. The court's obviousness analysis is inconsistent with a construction requiring that BAC have only some effect, but need not meet compendial standards.

## C. <u>Enablement</u>

Alcon's arguments regarding enablement depend on understanding that the claimed BAC concentrations must merely avoid completely "ceas[ing] to act as an anti-microbial preservative." Reply 65. Under that construction, Alcon asserts,

there is no inconsistency between enablement and obviousness. *Id*. As discussed, however, the district court's obviousness analysis focused on whether there was sufficient evidence that a composition with the same components as claimed would achieve preservative efficacy comparable to that provided by BAC at concentrations used in prior art commercial formulations.

Alcon further argues that the "distinct standards for obviousness and enablement" preclude any inconsistency in the court's analysis. Reply 66. The problem with Alcon's argument is that the court found the prior art disclosed using the same borate-polyol complexes in the same concentrations as claimed to enhance BAC's anti-microbial activity. Appx104. The court also found that the prior art teaches to "formulate a composition with a lower BAC concentration" to avoid BAC's side effects, "while maintaining efficacy by combining the BAC with a borate-polyol complex." Appx101. The only additional teaching in the specification that Alcon cites is the measurement of the resulting composition's preservation activity at the lower BAC concentrations. Reply 66-67.

Alcon's brief does not address any of the evidence and testimony from its own witnesses explaining why even minor changes in BAC concentration would not meet preservative efficacy standards. Padagis Opening Br. 71-72. Nor does Alcon explain how the efficacy testing results in the patent, carried out at BAC concentrations orders of magnitude higher than those claimed, provide any

additional guidance beyond the routine optimization taught in the prior art.  Padagis Opening Br. 70-71.  Instead, Alcon raises the "absolute-value reduction" in concentration.  Reply 67.  The gist of this theory is that the proper comparison between BAC formulations involves subtracting one BAC concentration from another instead of looking at the relative amounts.  *Id*.  The genesis of this argument is unclear, and the district court's decision did not address it.  Instead, the district court considered the relative changes in concentration, not the so-called "absolute-value reduction" suggested by Alcon on appeal.  *See* Appx107 (assessing obviousness based on a concentration "three times that high").

Regardless, the district court made clear that its enablement decision was based on a claim construction that required only that BAC not "cease to have any anti-microbial effect."  Appx115.  "For that reason," the district court explained, Padagis did not establish "the claims are not enabled across the full range of BAC concentrations set forth in the claims."  *Id*.

Claims like the ones at issue are routinely limited by judicious application of section 112.  When a patentee claims more than what was invented, it runs afoul of section 112's requirement that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains…to make and use the same…."  35 U.S.C. § 112.  Here, the patent claims

a range of BAC concentrations that goes from 0.0035 w/v %, just below that used in prior art commercial solutions, down to 0.00001 w/v %, which is one hundred times lower than any example in the specification or composition tested by the inventors. The patent is silent on how to bridge the gap between the example compositions with 0.001 w/v % BAC and compositions with BAC concentrations ten or one hundred times lower while maintaining efficacy, and contains no evidence that compositions with such miniscule concentrations of BAC have ever been successfully used as multi-dose ophthalmic compositions. Instead, the inventor mentions, in passing, only that "the concentration of BAC in the composition is greater than 0.00001 w/v % but less than 0.0035 w/v %." Appx133 3:34-37; *see also* Appx133 4:47-51.

An allegedly novel piece of the invention is that the ophthalmic composition "includes low concentrations of BAC while exhibiting improved anti-microbial activity…." Appx133 3:18-22; *see also* Appx130 Abstract (compositions have "sufficient antimicrobial activity" and "a low concentration of benzalkonium chloride"); Appx135 8:60-64 ("Notably, prior to the present invention, relatively high concentrations of benzalkonium chloride were typically needed to preserve anionic polymer based suspensions as well as other ophthalmic compositions to Ph. Eur. B or Ph. Eur. A criteria."); Appx136 9:51-54 ("an advantage of the present invention" involves "lower concentrations of BAC"). "It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an

invention in order to constitute adequate enablement." *Brita LP v. Int'l Trade Comm'n*, 156 F.4th 1326, 1339 (Fed. Cir. 2025) (*quoting Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)). Relying, as Alcon did here, on the skilled artisan's knowledge for enablement "essentially places the entire inventive effort on one of ordinary skill in the art." *Brita*, 156 F.4th at 1339. "This violates the very quid pro quo central to the enablement requirement," that the patentee must "teach the public how to practice the full scope of the claimed invention." *Id.* (cleaned up).

## CONCLUSION

The district court applied an inconsistent understanding of the claims in its obviousness and enablement analyses. Properly construed, the claims require that BAC at the claimed concentrations provides sufficient anti-microbial activity for the multi-dose ophthalmic composition to meet preservation efficacy standards. The district court erred by applying an incorrect understanding of claim scope in its enablement analysis. This Court should vacate the judgment regarding enablement and remand for factual findings under the correct construction. If, on the other hand, this Court adopts Alcon's construction, requiring only "some" amount of anti-microbial efficacy, this Court should vacate the district court's obviousness decision. Then, on remand, the district court should assess whether it would have been obvious that compositions at the claimed BAC concentrations would maintain some efficacy,

even if it is negligible, undetectable, or otherwise insufficient for a multi-dose ophthalmic composition, consistent with the claim scope as Alcon would have it.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: _January 29, 2026_  By: _/s/ Carol Pitzel Cruz_
                              Carol Pitzel Cruz, *Principal Counsel*
                              William Zimmerman
                              Andrea Cheek
                              Jeremiah Helm
                              Aryeh Feinstein

                              *Attorneys for Defendants-Cross Appellants*
                              *Padagis Israel Pharmaceuticals Ltd., Padagis*
                              *LLC, and Padagis US LLC*

# CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on January 29, 2026, the foregoing brief was filed with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: January 29, 2026    By: /s/ *Carol Pitzel Cruz*

Carol Pitzel Cruz, *Principal Counsel*
William Zimmerman
Andrea Cheek
Jeremiah Helm
Aryeh Feinstein

*Attorneys for Defendants-Cross Appellants Padagis Israel Pharmaceuticals Ltd., Padagis LLC, and Padagis US LLC*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(b).  This brief contains 4,973 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u> January 29, 2026 </u>   By: <u>*/s/ Carol Pitzel Cruz*</u>
Carol Pitzel Cruz, *Principal Counsel*
William Zimmerman
Andrea Cheek
Jeremiah Helm
Aryeh Feinstein

*Attorneys for Defendants-Cross Appellants*
*Padagis Israel Pharmaceuticals Ltd., Padagis*
*LLC, and Padagis US LLC*